*Decision will be entered under Rule 50.*

WISCONSIN MEMORIAL PARK COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 46140. Filed May 20, 1957.

*Joseph E. Rapkin, Esq.*, and *William J. Willis, Esq.*, for the petitioner.

*John E. Owens, Esq.*, for the respondent.

FISHER, *Judge:* These proceedings involve the following deficiencies in petitioner's taxes determined by respondent:

| Year ended May 31 | Type of tax | Deficiency | Amount in controversy |
|---|---|---|---|
| 1944 | {Income tax | $5,426.70 | $5,416.50 |
| | {Declared value excess-profits tax | 1,405.53 | 1,405.53 |
| 1945 | Income tax | 2,196.08 | 2,196.08 |
| 1946 | {Income tax | 4,877.64 | 3,814.67 |
| | {Declared value excess-profits tax | 650.33 | 508.60 |
| 1947 | Income tax | 2,754.07 | [1] 3,892.18 |

[1] Overassessment of $1,138.11 claimed by petitioner.

The following questions are presented by these proceedings:

1. Whether respondent properly determined that certain amounts of interest expense accrued annually by petitioner on its books could not be taken as deductions from gross income on its tax returns.

2. Whether, as a result, respondent properly disallowed a deduction of a claimed net operating loss carryover for one of petitioner's fiscal years.

### FINDINGS OF FACT.

All facts stipulated herein are incorporated by this reference.

The petitioner was incorporated pursuant to Wisconsin law on May 2, 1929. At all times thereafter it has had an authorized capital of 25,000 shares of common stock, par value $1 per share, and 15,000 shares of preferred stock, par value $1 per share. The petitioner, since its organization, has been engaged in the business of owning and operating a cemetery known as Wisconsin Memorial Park located in the town of Brookfield, Waukesha County, Wisconsin, about 12 miles northwest of downtown Milwaukee.

At the time of its organization petitioner issued to Kurtis R. Froedtert (hereinafter referred to as Froedtert) 15,000 shares of preferred stock and 24,998 shares of common stock in consideration for a 100-acre tract of land. Thereafter 14,950 shares of Froedtert's preferred stock were transferred in small amounts as bonuses to purchasers of cemetery lots, Froedtert retaining the remaining 50 shares. By December 8, 1934, 210 shares of the preferred stock had been reacquired by him. Of the 24,998 shares of common stock originally issued to Froedtert, 4,997 shares were assigned on or before January 29, 1930, to various directors of petitioner, unrelated to Froedtert, leaving 20,001 shares of common stock which were owned by Froedtert on April 19, 1933.

It does not appear that Froedtert was an officer of petitioner during the course of any of the following material events herein. Henry S. Wright was, for a time, petitioner's president (at least between 1934 and 1940) and was followed in office, upon his retirement, by Henry T. Ott. Various others apparently unrelated to Froedtert held petitioner's different offices from time to time. One such was F. W. Breidster, who was petitioner's vice president in and around 1934.

In 1930 Froedtert guaranteed a note or notes of petitioner to the First Wisconsin National Bank of Milwaukee evidencing a loan from that bank to petitioner in the face amount of $250,000. On April 19, 1933, as security for this guaranty, Froedtert transferred his 20,001 shares of petitioner's common stock in trust to himself, Henry S. Wright, and E. P. Ormsby, as voting trustees, subject to a previous pledge of such shares to the First Wisconsin National Bank of Milwaukee, further securing the guaranty.

The voting trust agreement contained, among other things, the following provisions:

3. Any dividends received by the Trustees on account of the stock standing in their name shall be paid by them to said Froedtert, his heirs and assigns, upon receipt thereof.

4. The Trustees shall vote upon said shares of stock at all meetings of the company, annual or special, upon any resolution, matter or business that may be submitted to any such meeting, and they shall possess in that respect the same powers as though they were the owners of the equitable as well as the legal title to said stock. The Trustees may act at any such meeting by proxy or agent and appoint such proxy in writing.

5. The action of a majority of the Trustees expressed from time to time at a meeting or by writing without a meeting shall constitute the action of the Trustees and have the same effect as if assented to by all.

6. The Trustees may cause to be transferred to any person one (1) share of stock for the purpose of qualifying such person as a director of Wisconsin Memorial Park Company, and cause a certificate of stock evidencing the share so transferred to be issued in the name of such person and provide for the deposit and pledge of such share of stock with said Bank as Collateral security.

7. In the event of the death, resignation or inability of any trustee to act, a successor trustee may be appointed by an instrument in writing subscribed by the remaining trustees, and in the event of failure of the Trustees to agree upon a successor trustee then and in that event such successor trustee shall be appointed by the vote of the remaining Trustees together with the vote of a representative of said Bank, and such appointment may be made by the action of any two (2) persons by whom such appointment may be made.

8. Upon the termination of the term of this trust the Trustees shall transfer all their right, title and interest in and to the shares of stock of Wisconsin Memorial Park Company which are the subject of this trust to said Froedtert.

9. The trustees [sic] hereunder shall terminate on the 19th day of April, 1938, or at such earlier time as the Trustees or a majority of them may determine.

10. The terms of said trust may be amended or modified by the Trustees with the consent of said Froedtert; provided however, that no amendment or modification may be made which shall in any wise impair the rights of the Bank as pledgee of the shares of stock held by the Trustees.

No transfer of stock to the voting trustees was recorded in stock transfer books of petitioner.

On June 21, 1934, Froedtert, who was then being pressed by the bank on his guaranty of the petitioner's indebtedness, purchased the bank's claim against the petitioner which then equaled $249,866.75

including interest. At the same time, he took an assignment of all collateral which had been pledged to the bank. At this time the petitioner also owed Froedtert additional sums on other loans and advances. After the acquisition of the bank's claim Froedtert's total claim against the petitioner was approximately $400,000.

By a document dated December 8, 1934 (hereinafter called the agreement), Froedtert canceled all of petitioner's indebtedness to him in excess of $200,606.44, and, on behalf of petitioner, delivered all the shares of common and preferred stock of petitioner standing in his name on its books to Henry S. Wright, as trustee, as security for the indebtedness of $200,606.44 due by petitioner to him, declaring that he had "quit-claimed and assigned" all of his right, title, and interest in said stock to the company. The other parties to the agreement executed on December 8, 1934, were Dr. Henry A. Pfeifer, Milford A. Breidster, and Fred W. Breidster. Dr. Pfeifer and the Breidsters had been co-guarantors with Froedtert of petitioner's obligations to First Wisconsin National Bank and were made parties to the agreement of December 8, 1934, in order to preserve Froedtert's right to have the collateral which they furnished the bank in connection with their guaranty continue as additional security for the remaining indebtedness to Froedtert.

The agreement provided, among other things, as follows:

WHEREAS, the Company owes to various of its creditors approximately Five Hundred Thousand Dollars ($500,000.00), which obligations are presently due and owing and which are hereinafter referred to as "fixed liabilities"; and

WHEREAS, approximately Four Hundred Thousand Dollars ($400,000.00) of said fixed liabilities is presently due and owing to Froedtert by the Company; and

WHEREAS, the Company has represented to Froedtert and its other creditors, and does now affirm and represent, that it is unable to pay its fixed liabilities either in whole or in part; and

WHEREAS, the parties hereto, by their respective attorneys, have been advised of the limitations of the right of a creditor to proceed to collect or satisfy any claims out of and from the assets of any person, firm or corporation conducting a cemetery business; and

WHEREAS, Froedtert's claim against the Company is at the present time of doubtful value and may be of some value only if his claim is secured and the Company procures a reasonable extension of time for the payment of all or most of its indebtedness,

Now, THEREFORE, For and in consideration of the sum of One Dollar ($1.00) each to the other in hand paid, receipt whereof is hereby acknowledged, and other good and valuable consideration, it is mutually agreed as follows:

1. Froedtert has, concurrently with the execution and delivery of this instrument, at the direction of the Company, delivered to Henry S. Wright, as Trustee, in trust for the uses and purposes hereinafter specified, all the shares of common and preferred stock of the Company standing in his name on the books of the Company, and has quit-claimed and assigned to the Company, subject to the provisions hereinafter set forth, all of his right, title and interest

in and to said stock or any of it, subject always to any right, title or interest which the Estate of William Zimmermann, deceased may have in and to said stock or any part thereof.

\* \* \* \* \* \* \*

3. The Company, on its part, acknowledges and affirms that it is indebted to Froedtert on said items hereinabove scheduled in paragraph numbered 2 in the total amount of Two Hundred Thousand Six Hundred Six and 44/100 Dollars ($200,606.44), and that in addition to the security hereinafter provided for, any and all security which Froedtert now has on any of the items of indebtedness retained by him, in whole or in part, shall remain in full force and effect, and that said security shall in no manner or in any wise be affected by this agreement, except as hereinotherwise provided.

4. Froedtert, on his part, further agrees that as to the said balance of Two Hundred Thousand Six Hundred Six and 44/100 Dollars ($200,606.44), he will extend the time for the payment of the said indebtedness to the 2nd day of January, 1938, upon the terms and subject to the provisions of a certain instrument of trust entered into between the Company and Henry S. Wright, as Trustee, concurrently with the execution and delivery of this agreement. \* \* \*

5. To further secure Froedtert as to the repayment of the balance of said indebtedness in the said sum of Two Hundred Thousand Six Hundred Six and 44/100 Dollars ($200,606.44) on or before said 2nd day of January, 1938, the Company, concurrently with the execution and delivery of this instrument, will cause Henry S. Wright, as Trustee, or any successor in trust of the trust created in and by said trust agreement hereinabove referred to, to hold the shares of common and preferred stock delivered by Froedtert to Henry S. Wright, Trustee, as hereinabove set forth, as collateral security for the repayment of the balance of said indebtedness, and will instruct and direct said Trustee or his successor in trust to hold said stock as further and additional security for the prompt and punctual payment of the indebtedness of the Company to Froedtert.

6. It is further agreed between the parties hereto that said stock so delivered to Henry S. Wright, Trustee, shall be delivered to him subject to the provisions of a certain voting trust agreement now in effect as to said stock, and that said voting trust agreement shall remain in full force and effect despite the delivery of said stock by Froedtert to the Company and to the said Trustee by Froedtert at the direction of the Company, and that said voting trust agreement shall remain in full force and effect for the entire period provided for in and by said voting trust agreement.

7. To further secure Froedtert as to the repayment of said balance of Two Hundred Thousand Six Hundred Six and 44/100 Dollars ($200,606.44) on or before the said 2nd day of January, 1938, the parties of the third part have assigned, transferred and conveyed unto said Henry S. Wright, as Trustee, and to his successor or successors in trust of the said trust created in and by the trust agreement hereinabove referred to, the securities scheduled and fully set forth in Exhibit A hereto annexed and made a part hereof, which Trustee and his successor or successors in trust shall hold said securities set forth in said Exhibit A as further and additional collateral security for the repayment of said indebtedness on or before the said 2nd day of January, 1938.

8. It is agreed between the parties hereto that the said indebtedness of Two Hundred Thousand Six Hundred Six and 44/100 Dollars ($200,606.44) shall bear interest at the rate of six per cent (6%) per annum, payable annually, out of funds collected by the Trustee under the Trust Agreement (Deed of Trust).

9. It is further agreed and understood that said Henry S. Wright, as said Trustee, and any successor or successors in trust shall be authorized and empowered, on the *non-payment of the principal of said indebtedness at maturity or the interest when due,* or upon default in complying with the terms and conditions of said trust indenture, to sell, assign, convey, transfer and deliver, *with or without advertisment, or notice of any kind,* said Wisconsin Memorial Park Company stock and the securities set forth in Exhibit A hereto attached, *all at the option of Froedtert and with the right in Froedtert to be the purchaser,* * * * [Emphasis supplied.]

In his personal income tax return for 1934 Froedtert claimed a deduction for the indebtedness of petitioner which he had canceled and for the 20,001 shares of common stock which he had assigned to the trust on behalf of petitioner. The deductions claimed were allowed for Federal income tax purposes. In 1940, a field examination had been made of Froedtert's 1934 income tax returns by the Federal taxing authorities. In connection with this examination Froedtert had executed an affidavit which stated, in part:

7. That, in consideration of the Wisconsin Memorial Park Company agreeing to give him and such of the other creditors as were willing to grant a reasonable extension of time of their debt, a mortgage on a substantial portion of the cemetery lots as security for their remaining debt and agreeing to enter into an agreement whereby certain portions of the proceeds from the sale of its property would be applied on the remaining debt, he agreed to and did cancel $217,008.82 of the total debt owing to him by said Wisconsin Memorial Park Company and also agreed to, and did, surrender to the corporation all stock held by him in the corporation (said stock, at the suggestion of the company, was also pledged as security to the remaining debt owing to him).

On December 8, 1934, as indicated in the foregoing agreement, the petitioner had also executed concurrently therewith a mortgage or trust indenture of certain of its real estate to Henry S. Wright, as trustee, to secure its remaining indebtedness to Froedtert and certain other creditors. Said mortgage contained, among other things, the following provisions:

And the said Wisconsin Memorial Park Company, mortgagor, hereby undertakes and agrees that so long as this mortgage shall be unsatisfied, it will neither declare, set aside for payment nor make any payment of dividends on any of its capital stock, nor repurchase any of its capital stock, excepting only as to any repurchase from Mr. Kurtis R. Froedtert of any or all of the stock owned by him or in which he may have or claim to have an interest, the sale, delivery or surrender of which said stock, if consummated, will be and constitute part of the consideration for the execution and delivery by Wisconsin Memorial Park Company of this mortgage.

\* \* \* \* \* \* \*

It is hereby agreed by and between the parties hereto that all sums of money paid to the Trustee by virtue of the provisions hereof shall be distributed as follows, to-wit: Eighty per cent. (80%) thereof to Kurtis R. Froedtert, and the balance, to-wit; Twenty per cent. (20%) to be paid to the other creditors secured by this mortgage pro rata as their respective claims appear in the schedu¹⁻ marked Exhibit A appended hereto, \* \* \*

\* \* \* \* \* \* \*

In case of the failure or neglect of the mortgagor, its successors or assigns, to fully pay and discharge its said obligations, all as set forth in Exhibit A hereto appended, on or before the 2nd day of January, 1938, or to keep and perform any or either of the covenants, terms and conditions herein prescribed to be by the mortgagor kept and performed, if such default of the mortgagor, its successors or assigns, shall continue for thirty (30) days, the balance of the indebtedness due and owing by the mortgagor to the creditors named in Exhibit A appended hereto, together with the accumulated interest, shall, at the option of the said creditors hereby secured representing not less than a majority in amount of the indebtedness hereby secured, be deemed to have become due without notice, notice of such option being hereby expressly waived. The same shall thereupon be collectible by suit at law by the creditors, individually or collectively, or by foreclosure of this mortgage by the Trustee, in the same manner as if the whole of said principal sum had been made payable at the time when any such default shall occur, as aforesaid; and it shall be lawful, in each and all such cases, for said Trustee, for the benefit of the creditors hereby secured, to grant, sell and convey the property included herein at public auction or vendue, and on such sale to make and execute to the purchaser or purchasers good and sufficient deeds of conveyance in the law, pursuant to the statute in such case made and provided; * * *

\*       \*       \*       \*       \*       \*       \*

PROVIDED ALWAYS, and these presents are upon this express condition, that if said Wisconsin Memorial Park Company, mortgagor, its successors or assigns, shall pay or cause to be paid the said indebtedness set forth in Exhibit A hereto attached at or before maturity and shall pay annually the interest on said obligations at the rate of six per cent. (6%) per annum, and shall otherwise keep and perform the several covenants and conditions herein prescribed by the mortgagor to be kept and performed, at the times and in the manner herein provided, then and in that event these presents shall be null and void.

\*       \*       \*       \*       \*       \*       \*

It is further agreed that if, at any time, any vacancy is created in the office of Trustee not hereinabove provided for, said vacancy may be filled by action of a majority in amount of the then existing creditors of the mortgagor secured by this mortgage.

The following stock transfers of record appear in petitioner's stock transfer books:

On December 8, 1934, certificate No. 434 issued to Froedtert on July 1, 1931, for 20,001 shares of common stock was canceled and a new certificate, No. 439, for the same shares was issued in the name of Henry S. Wright, trustee. This certificate was canceled on August 13, 1940, and a new certificate, No. 449, was issued for the same shares to Howard T. Ott, trustee. Certificate No. 449 is still outstanding.

On December 8, 1934, certificates Nos. 526, 528, 536, and 537, issued to Froedtert at various times in 1934 for a total of 260 shares of preferred stock, were canceled and a new certificate, No. 538, was issued for the same shares in the name of Henry S. Wright, trustee. Certificate No. 538 was canceled on December 7, 1937, and on the same date certificate No. 551 was issued in the name of Kurtis R. Froed-

tert for 1 share and certificate No. 552 was issued in the name of Henry S. Wright, as trustee, for 259 shares. Certificate No. 551 is still outstanding. Certificate No. 552 was canceled on August 13, 1940, and certificate No. 564 for the same shares was issued on that date in the name of Howard T. Ott, trustee. Certificate No. 564 is still outstanding.

Certificate No. 551 for 1 share of preferred stock of petitioner, issued December 7, 1937, in the name of Kurtis R. Froedtert, was the only stock of petitioner of any kind registered in the name of Froed tert during any of the taxable years involved in this proceeding.

Petitioner's indebtedness to Froedtert was originally due in fuli on January 2, 1938. Thereafter Froedtert extended the maturity of petitioner's indebtedness to him to January 2, 1939, and January 2, 1940, respectively. Subsequently, on June 10, 1939, August 1, 1940, and again on February 17, 1942, the maturity date of petitioner's indebtedness to Froedtert was extended to such time as the petitioner repaid certain loans made from the Marshall and Ilsley Bank (here- inafter referred to as the bank).

Petitioner was indebted to Marshall and Ilsley Bank as of May 31, 1942, and as of May 31, 1943. The indebtedness owed by petitioner to the Marshall and Ilsley Bank was fully paid as of May 31, 1944. There was no written extension of the maturity date of the indebted- ness due from the petitioner to Froedtert from May 31, 1944, to October 30, 1948, and petitioner was in default at least in the pay- ment of interest on its obligation to Froedtert under the December 8, 1934, agreement throughout that period. On October 30, 1948, Froedtert formally extended the ultimate maturity date for the in- debtedness owed to him by the petitioner to December 31, 1949.

On August 13, 1940, Henry S. Wright resigned as trustee under the agreement of December 8, 1934, and Howard T. Ott was appointed successor trustee by the parties in interest—namely, petitioner, Pfei- fer, Milford Breidster, Fred W. Breidster, and Froedtert (referred to as the undersigned)—in an agreement executed by them which stated in part:

THE UNDERSIGNED do further herewith nominate and appoint and consent to the appointment of Howard T. Ott as Trustee in place of said Henry S. Wright under the aforementioned agreement dated December 8, 1934, and as Trustee under any and all other agreements in which said Wisconsin Memorial Park Company was or is a party or may otherwise be interested, including without limitation thereto, however, that certain Trust Indenture also dated December 8, 1934, recorded in the office of the Register of Deeds for Waukesha County, Wis- consin, on the 30th day of December, 1935, Volume 196 of Mortgages on Page 1, bearing Document No. 205798, and any amendments, extensions or supplements thereto, and any voting trust agreement under which said Henry S. Wright as Trustee was given any right to vote any stock of said Wisconsin Memorial Park

Company owned by or in which said Kurtis R. Froedtert has or had any interest, *said Kurtis R. Froedtert to be entitled henceforth to all rights to vote all or any part of said stock standing in the name of said Henry S. Wright as Trustee.*

THE UNDERSIGNED do herewith further authorize said Henry S. Wright to deliver, transfer, set over and assign to said Howard T. Ott as Trustee, any and all rights, property, securities or interest which said Henry S. Wright had or acquired as Trustee under all or any of the documents hereinbefore referred to specifically or generally. [Emphasis supplied.]

On that day Henry S. Wright executed a document transferring to Ott as successor trustee various securities which had been pledged by Pfeifer, Milford Breidster, and Fred Breidster. This latter document also purported to set over, transfer, and assign to Ott certain securities allegedly pledged to Wright as trustee by Wisconsin Memorial Park Company, to wit:

20,001 shares common capital stock, Henry S. Wright, trustee.
259 shares preferred capital stock, Henry S. Wright, trustee.
1 share preferred capital stock, Kurtis R. Froedtert.

On the same date Ott executed a receipt for the transferred securities. At all meetings of the stockholders of petitioner during the taxable years involved in this proceeding, the 20,001 shares of common stock and the 259 shares of preferred stock were voted by Ott.

On December 19, 1936, Henry S. Wright, as trustee, wrote Froedtert concerning payment to be made to him by the petitioner on its indebtedness as follows:

I wish to call your attention to the fact that all of the 80 per cent payments made to you in accordance with that certain trust indenture dated December 8, 1934, by and between the Wisconsin Memorial Park Company, myself and general creditors of the Park, has been applied against the principal amount of your claim against the Wisconsin Memorial Park Company, and accrued interest has been held in abeyance. This method I will continue to follow unless a change is arrived at at some later date by mutual agreement between Wisconsin Memorial Park Company and the general creditors and myself as trustee.

During all of the taxable years involved in this proceeding the payments made on petitioner's indebtedness to Froedtert were credited entirely to principal on the books of the petitioner. This method of crediting the payments had the effect of annually reducing the interest-bearing portion of the indebtedness so that the annual obligation for interest became smaller each year.

The annual amount of interest accrued on petitioner's indebtedness under the mortgage and the portion thereof allocable to Froedtert during each of the taxable years involved in this proceeding, together with the amount of principal paid, the remaining principal, and the accrued interest at the end of each of such taxable years is shown in the following tabulation:

| Year ended May 31 | Interest accrued on mortgage during year | Portion of interest allocable to Kurtis R. Froedtert | Paid on mortgage principal during year | Remaining principal end of year | Accrued interest end of year |
|---|---|---|---|---|---|
| 1941 | $11,603.43 | $9,711.50 | $5,084.23 | $191,159.83 | $83,194.61 |
| 1942 | 11,319.67 | 9,484.58 | 5,303.77 | 185,856.06 | 94,514.28 |
| 1943 | 10,882.07 | 9,134.45 | 8,826.38 | 177,029.68 | 105,396.35 |
| 1944 | 10,324.87 | 8,689.73 | 10,893.51 | 166,136.17 | 115,721.22 |
| 1945 | 9,631.14 | 8,133.62 | 11,351.13 | 154,785.04 | 125,352.36 |
| 1946 | 9,097.98 | 7,706.06 | 6,281.49 | 148,503.55 | 134,450.34 |
| 1947 | 8,643.76 | 7,343.74 | 10,603.04 | 137,900.51 | 143,094.10 |

None of the amounts shown in said tabulation as interest allocable to Froedtert were paid to Froedtert during any of the fiscal years May 31, 1941, to May 31, 1947, inclusive. In its Federal tax returns filed for each of its taxable years ended May 31, 1941, to May 31, 1947, inclusive, petitioner claimed, and respondent in his determination has disallowed, deductions for the accrued interest allocable to Froedtert, as set forth in the above tabulation.

Petitioner's Federal tax returns for its fiscal years ended May 31, 1941, to May 31, 1947, inclusive, were filed at Milwaukee within the time prescribed by law. During all of the taxable years involved in this proceeding petitioner kept its books and filed its Federal income tax returns on the accrual basis. For all of the taxable years involved in this proceeding Froedtert filed his Federal income tax returns on the cash basis. None of the above-stated amounts of interest which petitioner accrued on its indebtedness to Froedtert during the taxable years involved in this proceeding were included in gross income on Froedtert's Federal income tax returns.

Froedtert died on December 6, 1951. The executors of his estate are Joseph E. Rapkin, Leon F. Foley, William J. Janssen, and Howard T. Ott. The executors filed under oath a "true and perfect inventory of all of the real estate and all of the personal property" owned by Froedtert on the date of his death with the County Court of Milwaukee County. The only assets included in such inventory relating to petitioner are certain cemetery lots, 1 share of preferred stock, and the value of Froedtert's interest in the indebtedness under the mortgage.

Neither Froedtert's accountant, nor petitioner's secretary-treasurer, or the trustee under the agreement was aware of any understanding, intention, or agreement that the shares of stock held by the trustee would ever be returned to Froedtert or his estate.

During petitioner's taxable years ended May 31, 1941, to May 31, 1947, inclusive, more than 50 per cent in value of the outstanding stock of petitioner was owned, directly or indirectly, by or for Kurtis R. Froedtert.

OPINION.

## *I.*

Petitioner regularly accrued on its books and took as deductions on its tax returns certain amounts for accrued interest expense on an indebtedness to Froedtert, for each of its fiscal years ending May 31, 1944, through May 31, 1947, which deductions were disallowed by respondent, and deficiencies determined as set forth above. The present dispute centers about 1939 Code section 24 (c),[1] which sets forth three conditions whose combined presence in any taxable year would require the disallowance of an interest expense deduction otherwise allowable under section 23 (b).[2] More specifically, the disagreement resolves itself down to whether petitioner and Froedtert were "persons between whom losses would be disallowed under section 24 (b)"[3] within the meaning of subparagraph (3) of section 24 (c), since the other two conditions appearing therein are admittedly present.[4] The only relationship covered by section 24 (b) here in question is whether or not, under section 24 (b) (1) (B), Froedtert and petitioner were "an individual and a corporation more than 50 per centum

---

[1] SEC. 24. ITEMS NOT DEDUCTIBLE.

(c) UNPAID EXPENSES AND INTEREST.—In computing net income no deduction shall be allowed under section 23 (a), relating to expenses incurred, or under section 23 (b), relating to interest accrued—

(1) If such expenses or interest are not paid within the taxable year or within two and one half months after the close thereof; and

(2) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and

(3) If, at the close of the taxable year of the taxpayer or at any time within two and one half months thereafter, both the taxpayer and the person to whom the payment is to be made are persons between whom losses would be disallowed under section 24 (b).

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(b) INTEREST.—All interest paid or accrued within the taxable year on indebtedness, \* \* \*

[3] The only relevant "persons" thus referred to appear in subparagraph (B) of section 24 (b) (1) as follows:

(B) \* \* \* an individual and a corporation more than 50 per centum in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;

In this regard, section 24 (b) (2) (A) and (E) states the following rules:

(2) STOCK OWNERSHIP, FAMILY, AND PARTNERSHIP RULE.—For the purpose of determining, in applying paragraph (1), the ownership of stock—

(A) Stock owned, directly or indirectly, by or for a corporation, partnership, estate, or trust, shall be considered as being owned proportionately by or for its shareholders, partners, or beneficiaries;

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(E) Constructive Ownership as Actual Ownership.—Stock constructively owned by a person by reason of the application of subparagraph (A) shall, for the purpose of applying subparagraph (A), \* \* \* be treated as actually owned by such person, \* \* \*

[4] It does not appear to be contested that the amounts of interest expense involved were properly accruable.

in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual."

In determining whether or not the statutory provisions in question are here applicable, and to prevent the mischief which Congress sought to prevent by their enactment, we must bear in mind that administration of the income tax laws presents practical problems in relation to which we must look beyond mere form to the substance of the transactions in issue. We have no doubt that the mischief at which the 1939 Code section 24 (c) is expressly directed (viz, an artificial debtor-creditor arrangement between closely related or controlled parties whereby interest expense deductions are created for one without a corresponding reflection of interest income to the other) exists in the present record. It is plain that petitioner has regularly taken deductions for interest expense on the outstanding indebtedness to Froedtert involved herein without actually having paid any interest to him and that Froedtert (petitioner's founder and admittedly owner of 20,001 of the 25,000 outstanding shares of its common stock and 260 of the 15,000 shares of its preferred stock at the time the generative transactions of the questioned deductions were accomplished) never reported any interest income. Upon our careful consideration of all the circumstances herein, we do not think petitioner has proven that respondent's disallowance under section 24 (c) (3) of the claimed interest deductions was erroneous.

It is petitioner's position, essentially, that the relationship between itself and Froedtert was not such as to require section 24 (c) disallowance of the claimed accrued interest deduction, asserting that it has successfully established that Froedtert's only interest in any shares of its stock, other than a single share of its preferred stock, was a security interest as its creditor. In support of the contention that Froedtert owned only the 1 share of its preferred stock, petitioner relies on the fact that only 1 such share was recorded in Froedtert's name in its stock record book and that the assignment from Henry S. Wright, as retiring trustee, to Howard T. Ott, his successor on August 13, 1940, recited "1 share preferred capital stock, Kurtis R. Froedtert" as amongst the securities "pledged by Wisconsin Memorial Park Company." To support its contention that Froedtert's only interest in any other of its outstanding shares was a security interest as its creditor, petitioner largely asserts that by the December 8, 1934, agreement Froedtert meant to divest himself of all rights to the stock. In this connection, petitioner claims that the actions of the parties to various documents are inconsistent with ownership by Froedtert. Referred to are, again, the stock transfer book and trustee assignment recitations, declarations in Froedtert's 1934 tax return wherein he claimed a loss for the canceled indebtedness and surrender of the shares

in question, further declarations by Froedtert in 1940, in an affidavit supporting his right to the claimed loss deductions filed in the course of an examination of his 1934 return, and the fact that the executors of Froedtert's estate listed only 1 share of petitioner's preferred stock among his assets at death. Petitioner does not question the fact that the shares of stock involved in the issues before us represented more than 50 per cent of the value of petitioner's outstanding stock.

It is patent from the Findings of Fact that, while the 20,001 shares of common stock were registered in the names of various trustees, Froedtert was careful to retain practical control and significant incidents and indicia of ownership.

The voting trust (which was no more than that) was created on April 19, 1933. It provided for termination not later than April 19, 1938. Froedtert was one of the three trustees. The trust provided that any dividends declared on the stock held by the trustees were to be paid to Froedtert, and that the stock was to be transferred back to Froedtert upon the expiration of the voting trust. We think there can be no doubt that the trustees held the stock for Froedtert and that Froedtert was the equitable owner. The stock had been pledged to the bank as security for the indebtedness to it which Froedtert had guaranteed, but Froedtert bought the bank's claim in 1934.

The agreement of December 8, 1934 (made subject to all of the provisions of the voting trust); in part purported to represent a quitclaim and assignment by Froedtert to petitioner of all of the common and preferred stock of petitioner owned by Froedtert, together with, in effect, a retransfer of the stock by petitioner to a trustee as security for petitioner's indebtedness to Froedtert. It is clear, however, that Froedtert acquired no additional security from the transfer, retransfer, and pledge of the stock in question, since he already owned the stock at the time the agreement was executed. Moreover, the agreement of December 8, 1934, recites the fact that Froedtert's claim was then of "doubtful value," and petitioner admits in its reply brief that the express reason for surrendering the stock was to enable Froedtert to get the benefit of a loss deduction on the forgiveness of about $200,000 of the $400,000 indebtedness due by petitioner to Froedtert which forgiveness was accomplished in the same transaction. It also laid the foundation for Froedtert's deduction of a loss on the stock. In addition, we think it apparent that there was the further objective of laying the foundation for the subsequent acts of the parties, i. e., accrual of interest by petitioner without any payment of interest to Froedtert, with the intention of claiming interest deductions on the part of petitioner for tax purposes without any corresponding inclusion of interest by Froedtert in his own returns. (In this connection, see excerpt from letter of December 19, 1936, from Henry S. Wright, trustee, to Froedtert, quoted in our findings.)

We point out also that the pledge agreement of December 8, 1934, empowered the trustee to whom the stock was transferred, to sell the stock, upon default by the petitioner *with or without advertisement or notice of any kind, at the option of Froedtert, and with the right of Froedtert to be the purchaser.*

Petitioner argues on pages 31 and 32 of his brief that:

As a mere pledgee, Froedtert had no ownership rights to the pledged property unless he foreclosed on his pledge, or at least until there was a default. * * * It has been stipulated, however, that the time for payment was duly extended beyond the period here involved, so that petitioner was not in default on its obligations under the agreements.

Respondent argues that petitioner was in fact in default throughout the period between May 31, 1944, and October 30, 1948.

The relevant portion of the stipulation is as follows:

Froedtert extended the maturity of the Company's indebtedness to him to January 2, 1938. Maturity of this obligation was further extended from time to time through the taxable years in question. Exhibits 4, 5, 6, 7, 8, 9 and 10 * * * [effected] such extension to December 31, 1949.

A careful review of the exhibits referred to in the stipulation leaves us in some doubt as to whether there existed any extension of the maturity date during the period from May 31, 1944, to the beginning of the calendar year 1948. There is no evidence of a written extension during that period. We do not think it necessary, however, to analyze the exhibits in our Opinion or to determine whether the stipulation is to be construed as petitioner maintains. In any event, any such extensions were voluntary on Froedtert's part, and in no way inconsistent with the view that he was in practical control of the situation when he granted them.

Of greater significance, however, is that, accepting the view that the maturity of the payments of principal was extended from time to time during the entire period in question, it is nevertheless evident (and not in conflict with the stipulation) that no interest had been paid during that period. There is no evidence of an extension of time to pay interest, and nothing to show that the interest payments were not in default. During the period in question, petitioner consistently accrued such interest when due under the agreement. It is true that Froedtert acquiesced in the application of all payments to principal instead of to interest, but there is no evidence that he waived the payment of interest even though he did not act to cause his lien to be foreclosed or otherwise attempt to enforce collection. Since the interest was in default (or at least petitioner has offered no evidence to the contrary) such default was sufficient under the express terms of the agreement of December 8, 1934, to empower the trustee, during any of the years in question (after giving the 10-day notice required by the Wis-

consin law), to sell the stock at Froedtert's option, with the right in Froedtert to be the purchaser, at private sale. Froedtert thus had the continuing power, during the taxable years in question, and at his option, to buy back the stock at what for practical purposes would have been a nominal consideration in view of his right under the agreement to purchase, and petitioner's indebtedness to him secured by the pledge of the stock.

As already indicated, Froedtert's acquiescence in the application of payments to principal rather than to interest was merely another integrated facet in furtherance of the plan under which the attempt was made to reserve to the petitioner the right to accrue and deduct interest without such interest being taxed to Froedtert.

Another factor to be considered is that the agreement of August 19, 1940, pursuant to which the stock in question was transferred from the retired trustee, Wright, to Ott, his successor (Ott purportedly to succeed to all the rights and duties of Wright), expressly provided that "Kurtis R. Froedtert is to be entitled henceforth to all rights to vote all or any part of said stock standing in the name of Henry S. Wright as trustee." Although Ott actually attended petitioner's meetings and cast the votes represented by said shares, it is clear from the terms of the agreement that Froedtert had the power to do so. Petitioner's answer is that a typographical error "may" have caused the name Kurtis R. Froedtert to be inserted in the above-quoted language rather than that of Howard T. Ott. The contention is purely speculative and unsupported by the evidence. Moreover, the grant to Froedtert of the power to vote appears consistent with the over-all plan to keep practical ownership and control in himself while leaving nominal title in others.

In sum, from beginning to end, each step was taken on the basis of arrangements which preserved Froedtert's practical ownership of the stock, and assured him of the continuing power, at least during the years here significant, to revest the stock in himself at the same time keeping the bare legal title to the stock out of his name. The agreement of 1940 granting Froedtert the right to vote was, we think, merely supplementary to the prior understandings and was consistent therewith. It is quite apparent from the record that all of the arrangements were made pursuant to agreement among a closely knit group, none of whom gave any indication of opposition to the wishes of Froedtert. And all steps moved in an unswerving path toward the three basic objectives: A loss deduction to Froedtert; interest deductions by petitioner; and the avoidance of interest income to Froedtert.

We recognize, of course, that taxpayers are privileged to so arrange their affairs as to pay the lowest tax which the applicable law

permits. At the same time, if the steps taken are artificial and calculated to serve no practical purpose other than tax minimization, such circumstances may be taken into consideration in determining the real substance of the transactions as distinguished from their form.

We have carefully considered *John A. Snively, Sr.*, 20 T. C. 136 (1953), relied upon by petitioner and find that it is distinguishable from the instant case on its facts. In *Snively*, the corporation involved sold its assets to a family trust, and the assets so sold became trust assets. We held that a trust was not an individual, and allowed a loss deduction to the corporation. In the case before us (which, of course, involves an interest deduction) the trustee, from his perspective, held petitioner's stock primarily as security for petitioner's indebtedness to Froedtert. The trustee was a mere conduit insofar as payments by petitioner on account of its indebtedness to Froedtert were concerned. Assuming, however, that the stock was conditionally an asset of the trust (to be turned over ultimately to petitioner), any such conditional ownership was subject to the prior interest of Froedtert, for whose security and protection it was purportedly pledged. Moreover, as fully discussed above, the indebtedness to Froedtert was in default, and he was in a position to cause a private sale of the security by the trustee, with himself as purchaser. We have no doubt that the proceeds would have been nominal, if a sale had been made; but whether nominal or substantial, the trust would again have been a mere conduit through which the proceeds of the sale would pass to him for credit on account of petitioner's indebtedness to him.

We think the same distinctions apply in principle with respect to *Lexmont Corporation*, 20 T. C. 185 (1953) (likewise relied upon by petitioner), which, however, did involve a deduction for accrued interest.

We recognize, of course, as do the cases discussed above, that a trust is not an individual within the meaning of section 24 (b) (1) (B). It is our view, however, that a holding to such effect is not here controlling because under the circumstances Froedtert was, directly or indirectly, the substantial owner of the stock.

Respondent, rightly we think, does not suggest that the provisions of section 24 (b) (2) (A) or 24 (b) (2) (E) are here significant. In any event, in view of our holding herein, it is unnecessary for us to consider whether or not such provisions are applicable.

We think it apparent upon the entire record that Froedtert's interest in the shares of stock in question was not that of a mere creditor; that the practical ownership remained in him; that the trustee under the agreement of December 8, 1934, was not in any

realistic sense the owner of the stock during the years in issue; and that the stock was owned directly or indirectly by or for Froedtert during such years within the meaning of section 24 (b) (1) (B).

## II.

The deficiency determined by the respondent for petitioner's fiscal year ending May 31, 1944, is based, in part, on the disallowance of a net operating loss for said year. It is conceded that only if petitioner is held to have properly deducted certain amounts of accrued but unpaid interest on its indebtedness to Froedtert for its fiscal years ended May 31, 1941, to May 31, 1943, inclusive, then the net operating loss claimed for 1944—computed upon the basis of net operating loss carryovers from the aforesaid earlier years, the determination of which losses were, in turn, dependent upon the aforementioned accrued interest deductions—is allowable. These amounts of interest were accrued and the deduction therefor taken upon the same theory as the deductions for the fiscal years ending May 31, 1944, through May 31, 1947, covered in our discussion under point I, *supra*. Accordingly, we hold that the earlier years' deductions were improperly taken and respondent's disallowance of the net operating loss carryover attributable thereto was correct. Sec. 122 (a), (b) (2) (A), and (c), I. R. C. 1939.

*Decision will be entered under Rule 50.*