The CHOCTAW NATION
v.
The UNITED STATES.
No. 4–54.

United States Court of Claims.
Nov. 8, 1955.

W. F. Semple, Tulsa, Okl., for appellant. Wesley E. Disney, Oklahoma City, Okl., was on the brief.

Robert E. Fraley, Oklahoma City, Okl., with whom was Asst. Atty. Gen., Perry W. Morton, for appellee.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The appellant sought, before the Indian Claims Commission, to recover the

value of 6,589,000 acres of land lying between the Canadian and Red Rivers, and extending from the 100th meridian, west longitude, more than 200 miles to the west. The appellant claims that it became the owner of this land by a grant from the United States in the Treaty of Doak's Stand of October 18, 1820, 7 Stat. 210, and that it conveyed it to the United States by the Treaty of June 22, 1855, 11 Stat. 611, receiving no consideration for its conveyance.

The Government's position is that the appellant never owned the land in question; that the Supreme Court of the United States so decided in prior litigation between the appellant and the United States, 179 U.S. 494, 21 S.Ct. 149, 45 L.Ed. 291; and that that decision makes the instant claim *res adjudicata*. The Indian Claims Commission sustained the Government's plea of *res adjudicata* and dismissed the appellant's petition. The appellant has brought the case here, insisting that the dismissal of its petition was erroneous.

The prior suit, the decision in which was held by the Indian Claims Commission to be a bar to the present one, was not a suit for the land with which the present case is concerned. It related to lands lying east of the 100th meridian. The reason why the Supreme Court considered, in that case, the Choctaws' claim of ownership of the land lying west of the 100th meridian, is stated in the Court's opinion as follows, 179 U.S. at page 503, 21 S.Ct. at page 153:

"The Choctaws also contend that they once owned, by transfer from the United States, a vast body of lands west of the Leased District, for which they have never received anything, and that the treaty of 1866 [14 Stat. 769] must be interpreted in the light of that fact. What connection such a fact, if it had any existence, could have with the construction of the treaty of 1866 it is not easy to perceive. But as the proposition just stated was the subject of much consideration in the court of claims, and as it is ear-

nestly pressed upon our attention, we will first inquire whether the Choctaws ever owned any lands west of the Leased District, that is, west of the 100th degree of west longitude, and then bring into view the circumstances leading up to the treaty of 1866 which, it is argued, throw light on its interpretation. This being done, we will examine the provisions of that treaty so far as they bear upon the title to the particular lands in dispute."

The opinion then devotes eight pages to the consideration of the question and comes to the definite conclusion that the Choctaws did not at any time own the lands west of the 100th meridian. As is apparent from the quoted statement, and from the decision of this court, 34 Ct.Cl. 17, the Choctaws, in the former case, presented the question of their ownership of the lands involved in the instant case for decision, not because that was the ultimate question to be decided in the former case, but because they thought that if they could establish ownership of those lands, it would be strong evidence to support their interpretation of the treaty there involved. They persuaded this court that they did own the lands west of the 100th meridian, and the fact of that ownership was a factor in inducing this court to interpret the treaty there in question as they wanted it interpreted. They pressed the same arguments upon the Supreme Court, but did not succeed in convincing that Court. The Supreme Court also decided the ultimate question against them. It might have done so even if it had found that they had owned the lands west of those there in question. From the statement above quoted "What connection such a fact, if it had any existence, could have with the construction of the treaty of 1866 it is not easy to perceive", it may be inferred that the Court's conclusion on the intermediate fact did not affect its ultimate decision.

 However that may be, the Choctaws presented the question for decision, it received detailed and careful

consideration and was, in fact decided. We think they have had their day in court on the question. We think the situation is fairly comparable to that of a prior decision which is rested on two grounds. Although the decision would probably have been the same if either one of the grounds had been lacking, yet that does not make both or either of the grounds *obiter dictum*. United States v. Title Insurance & Trust Co., 265 U.S. 472, 486, 44 S.Ct. 621, 68 L.Ed. 1110. The situation is also comparable to that of a case in which a court considers and decides a question presented to it as one step in the logical development of its ultimate decision. It then passes on to the next question, and its decision of that question is such that the ultimate decision would have been the same if the preceding question had not been decided at all, or had been decided the other way. But the question was presented and decided and is *res adjudicata*. Railroad Companies (Florida Central R. Co.) v. Schutte, 103 U.S. 118, 143, 26 L.Ed. 327.

■ The appellant urges that, even if the other requirements for *res adjudicata* were fulfilled, the doctrine is not applicable in this case because the law has been changed since the prior decision. The appellant says that the Indian Claims Commission Act of 1946, by its clause (5) of Section 2, 25 U.S.C.A. § 70a(5), which permits recovery on the basis of fair and honorable dealings, has changed the applicable law since the prior decision of the Supreme Court. See The Western (Old Settler) Cherokee Indians v. United States, 114 Ct.Cl. 716.

As we have said, the appellant claims that it acquired the lands involved in this suit by grant from the United States in the Treaty of 1820 and that it granted them back to the United States without consideration in the Treaty of 1855. If in fact the lands were not granted to it by the Treaty of 1820, there was no lack of fair and honorable dealing in the United States taking a quit claim conveyance from the appellant in the Treaty of 1855 to put to rest an unfounded claim.

The Treaty of 1820 contained the expansive language about the source of the Canadian river, which was more than 250 miles west of the 100th meridian. In 1819, Feb. 22, 1819, 8 Stat. 252, a treaty had been made with Spain recognizing the lands west of the 100th meridian as Spanish territory. This treaty was not ratified until 1821.

In the prior case the Supreme Court said, 179 U.S. at page 508, 21 S.Ct. at page 155:

"It cannot be doubted that the purpose of article 2 of the treaty of 1830 [7 Stat. 333] was to provide for a special grant to the Choctaws of the lands intended to be ceded to them by article 2 of the treaty of 1820, and no others. It was as if the parties declared that the words in the treaty of 1820, 'thence up the Arkansas to the Canadian Fork, and up the same to its source, thence due south to the Red river,' should be held to mean the same as the words in the treaty of 1830, 'thence to the source of the Canadian Fork, *if in* the limits of the United States, *or to those limits, thence* due south to Red river'. The treaty of 1830 plainly imports the understanding of the parties at that time that whatever might be the wording of the treaty of 1820, the United States had not thereby intended to grant, and the Choctaws had not thereby expected to receive, any lands at or near the source of the Canadian fork unless that point was within the limits of the United States—that both parties had in view at that time only lands within the limits of the United States.

"As the treaty of 1820 provided that the Choctaws should have lands as far west as the source of the Canadian river, it is suggested that the United States could not legally modify that provision by the subsequent ratification in 1821 of the treaty with Spain signed in 1819. But it was entirely competent for the parties, without any new or val-

uable consideration intervening, to rectify a mistake in the description of boundaries, and to agree as in effect they did by the treaty of 1830, that the words 'to the Canadian Fork, and up the same to its source,' in the treaty of 1820, were to be interpreted as meaning 'to the source of the Canadian Fork, if in the limits of the United States, or to those limits'—thus relieving the United States from any obligation to make a special grant to the Choctaws of lands which by the treaty with Spain, ratified in 1821, had been recognized as part of Spanish territory. After the treaty of 1830 the line 'thence due south to the Red river' was to be taken as running from a point on the dividing line between the United States and Spain, the 100th degree of west longitude as established by the treaty of 1819–1821, *thence due* south to that river."

Thus the Supreme Court considered the intention of the parties to the Treaty of 1820, and decided that they did not intend, in spite of the language which they used, that the grant should extend west of the 100th meridian. On that assumption, the Government's acceptance, without any separate consideration, of the appellant's quit claim in 1855 of its then asserted title, the only foundation of which was some language used by mutual mistake, involved no lack of fair and honorable dealing.

The Supreme Court considered and decided the very question which the appellant would have the Indian Claims Commission decide again, and differently. We think the Commission was correct in sustaining the Government's plea of *res adjudicata* and we affirm its decision.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.