Michael PERLMAN, a stockholder of Jones & Laughlin Steel Corporation, suing on behalf of himself and all other stockholders similarly situated and on behalf and in the right of Jones & Laughlin Steel Corporation, Plaintiff,

v.

John E. TIMBERLAKE and Jones & Laughlin Steel Corporation, Defendants.

United States District Court
S. D. New York.
March 26, 1959.

Morris J. Levy, New York City, for plaintiff.

Rosenman, Goldmark, Colin & Kaye, New York City, for defendant John E. Timberlake, Ambrose Doskow, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant Jones & Laughlin Steel Corp., John F. Dooling, Jr., New York City, of counsel.

Thomas G. Meeker, and J. Gordon Cooney, Washington, D. C., for Securities and Exchange Commission amicus curiae.

RYAN, District Judge.

In this suit filed under Section 16(b) of the Securities Exchange Act of 1934, (15 U.S.C.A. § 78p(b)) to recover short-swing profits all parties have moved for summary judgment.

The claim pleaded is that defendant Timberlake, while a director of corporate defendant Jones & Laughlin (J & L), between April 1, 1957 and July 16, 1957 sold 1,800 shares and bought under a restricted stock option plan 2,500 shares of J & L common stock at a statutory profit of $56,132.74, measured against the shares sold.

The answers of both defendants admit the transactions alleged—the sale and a purchase pursuant to a non-transferable option held by Timberlake under a Stock Option Plan, which they allege met all the conditions set forth in Rule X–16b–3 of the General Rules and Regulations under the SEA of 1934. The answers also allege as a defense the good faith reliance of Timberlake on this Rule. The

answer of Timberlake further pleads that any recovery of profits should be limited by Rule X–16b–6 and the answer of J & L in addition seeks a declaratory judgment of validity of Rule X–16b–3.

The Statutes and Rules under consideration are: The Securities Exchange Act of 1934, (Title 15, Sec. 78a et seq.),

Secs. 16(a) (b) (c)–78p; 23(a)–78w; 3(a) (12), 3(b)–78c; General Rules and Regulations under the SEA of 1934—:

Rules X–16B–3, (17 C.F.R. 240.16b–3) three versions as it read from 3/19/51 to 11/1/52; from 11/1/52 to 5/29/56; from 5/29/56 to date; X–16B–6 (17 C.F.R. 240.16b–6).

It is plaintiff's contention that Rule X–16B–3 has been held invalid by the Court of Appeals of this Circuit in the two opinions rendered in Greene v. Dietz, on June 7, 1957, and on the Petition for Rehearing August 12, 1957 (2 Cir., 247 F.2d 689 and 697); that this as a matter of law precludes reliance on the Rule by defendant Timberlake under Sec. 23(a); and that Rule X–16B–6 reducing the recoverable profits is invalid.

Defendants contend that the Court of Appeals did not determine invalidity; that the Rule is valid; and that in any event plaintiff may not recover because of Timberlake's good faith reliance on the validity of the Rule, but that if he be held liable, the profits are limited by Rule X–16B–6.

The Commission's motion to appear herein as amicus curiae in support of the validity of Rule X–16B–3 (it has filed a brief limited to that question) was granted on consent of all parties; it takes no position with respect to defendant's good faith or the validity of Rule X–16B–6.

The questions of law presented by the pleadings and the stipulated facts on these motions are: the validity of Rule X–16B–3; and if the Rule is found to be invalid by (a) a prior holding or (b) this court, defendant's immunity from liability under Sec. 23(a).

The following facts are not in dispute.

Plaintiff is a resident of State of New York and with his wife is co-owner of 11 shares of common stock of the corporate defendant.

Jones & Laughlin is a Pennsylvania corporation with its principal place of business at Pittsburgh whose common stock at all times material was registered on the New York Stock Exchange and was not an exempted security either under Secs. 3(a) (12) or 16(b) of the SEA of 1934; prior to June 5, 1953, and continuously since then defendant Timberlake has been a vice-president and since January 27, 1955 has also been a director of J & L, with his office at Pittsburgh and his residence a Mt. Lebanon, Pa. On January 17, 1951, a stock option plan applicable to officers and certain key employees was approved by amendment to the by-laws by a majority of the security holders entitled to vote at a special meeting for which proxies were solicited in accordance with the Rules and Regulations under Sec. 14(a) of the SEA (15 U.S.C.A. § 78n(a); the purpose of the plan was stated to be to provide added incentive to those charged with promoting the welfare of the corporation; the by-laws so amended authorized the Board of Directors to appropriate 15,000 shares of common stock for the Plan and to appoint a Stock Option Committee to administer the Plan subject to the approval of the Board of Directors. By amendment on December 9, 1954 this authority and power granted to the Stock Option Committee was given to the Compensation Committee and it was then also provided that no options were to be granted to any member of this Committee, although the Committee remained still subject to the Board of Directors, who themselves were eligible to participate in the plan. The option price, payable in cash, was set at the closing price on the day of the granting of the option or by amendment of February 8, 1952 at such higher price as the Committee might fix. No option was to be granted to any member of the Stock Option Committee with the exception of 15,000 shares (the maximum number) which were granted to Ben Moreell the Chief Executive Officer of the corporation, and also the

Chairman of the Committee; the number of optionees (who might also be members of the Board of Directors) was to be determined by the Board but was not to exceed 100; the option was exercisable for a period of 8 years but only by the optionee while alive, and transferable only on death by will or descent and distribution, with no restriction on the resale of the stock so acquired; and it was only exercisable after one year's employment and on consideration of the optionee's remaining in the employ of the Corporation for at least two years from the granting of the option.

It has also been stipulated that on June 4, 1953 the Board of Directors approved the grant of an option to Timberlake and on June 5, 1953, a formal stock option covering an additional 5,200 shares (apparently there had been a prior option covering 4,800 shares) was given him under an agreement containing the conditions set forth in the plan described; the option price was fixed at $27.94 per share ($10. par value) which was above the closing market price of $22.125 a share and provision was made for dilution. The agreement also provided that Timberlake was to receive for his services a regular salary and such additional compensation as might be fixed from time to time by the corporation which reserved the right to terminate the option upon the commission by him of any act inimical to it.

The SEC on May 29, 1956 amended Rule X–16B–3 so as to exempt from Section 16(b) stock acquired pursuant to non-transferable options; the amendment remains effective to date; on June 1, 1956, Sharp, vice-president in charge of legal and corporate affairs of J & L, sent a letter to eleven officers of J & L including this defendant advising them of the amendment of the Rule and informing them that by virtue of it they were now free to purchase stock under their options at any time and need no longer delay a purchase for more than 6 months following their last sale of stock, but cautioned them that the amended Rule did not apply to any purchase made prior to May 29, 1956 and that it did not exempt any purchase not made pursuant to the option—which would continue to be matched with any sale within 6 months. Timberlake received the letter and relied on the amended Rule described in the letter when through the Pittsburgh office of a Pennsylvania brokerage firm he entered into the following transactions: on April 9, 1957, he sold 300 shares of common stock of J & L on the New York Stock Exchange at 50⅛ realizing the net amount from such sale of $14,903.36; on July 12, 1957 he sold 1,500 shares of common stock on the New York Stock Exchange at 60½ realizing the net amount of $90,063.38; on July 16, 1957, he acquired directly from J & L at its Pittsburgh office 2,500 shares of common stock under his option agreement at $27.13 a share or at a cost to him for 1,800 shares of $48,834 ($27.13 represented a reduction in the option price of $27.94 to reflect a 3% dividend on December 28, 1956 in accordance with the anti-dilution provision). At the time of this purchase defendant Timberlake inquired of Wunderlich, vice-president and treasurer in charge of administering the plan, whether in view of his recent stock sales he would incur any Section 16(b) liability in making the intended purchase and was told that because of Rule X–16B–3 he would not. At that time neither Timberlake nor Wunderlich knew of the opinions in Greene v. Dietz of June 7, 1957 and neither learned of them or of the subsequent opinions until August 16, 1957 when they received a memorandum from J. T. Ross, Assistant General Counsel, to the effect that whereas Rule X–16b–3 had provided an exemption for stock acquired under a plan such as that of J & L and that it had been the opinion of their Legal Department that the stock was exempt, the Court of Appeals' recent opinion had cast doubt on the validity of the Rule and warned that it would be ill-advised to rely on it; and he concluded "although we think that the decision is wrong, you are hereby advised of the danger of reliance on Rule X–16B–3 at this stage."

J. T. Ross had read the first Greene opinions in the last week of June 1957 but had not communicated with any of the officers or directors of J & L until after the second opinions.

The first Greene v. Dietz opinions were reported in the New York newspapers on June 8, 1957; Timberlake was not in the City at any time from June 7 to June 10, 1957.

It is also stipulated that Timberlake relied in good faith on the Rule when he sold and purchased the 1,800 shares of stock, unless the further facts or the opinions in Greene v. Dietz "as matter of law preclude such finding of good faith". It is also agreed further, that on the first day on which he could have exercised his option the opening, high and low market price of J & L common stock was 24¼, 24¼ and 23⅞; the lowest market price within six months before and after April 9, 1957 was 45⅜ (on October 8, 1957); the lowest within 6 months before and after July 12, 1957 was 35¼ (on December 1957); and the high and low on July 16, 1957, 61⅞ and 61⅛. The profit made by Timberlake on his sales and purchase was $56,132.74 but if Rule X–16B–6 were to be applied the recoverable profit would be reduced to $38,479.24.

It appears that on April 9 and on May 8, 1958, replying to a request by plaintiff that the corporation institute suit to recover the profit, Sharp, vice-president and general counsel, declined to do so describing in detail the circumstances surrounding the Timberlake transactions and expressing the view that the Rule was valid. This suit followed.

One of plaintiff's arguments, which need not detain us, is that since, at the time the option was granted to Timberlake, the plan of J & L did not conform to the requirements of Rule X–16b–3, the acquisition of the stock by him at a subsequent time was not exempt under the amended Rule.

In 1951 and 1953, the plan permitted Ben Moreell, a member of the Committee which nominated optionees, to participate in the plan thus precluding it from coming within the protection of the Rule as

it then read. But, in 1956 the Rule was amended to remove this disqualification of a Committee member, and in 1957 when Timberlake exercised his option the plan conformed to the Rule.

We are concerned here with the effect of Rule X–16b–3 on the acquisition of the stock by Timberlake in 1957, not with its effect on the dates the plan was adopted or the option was granted to him. The Rule exempts "any acquisition" and when this acquisition took place the plan qualified. A similar argument was rejected by the trial Court in Greene v. Dietz, D. C., 143 F.Supp. 464, and its conclusion approved by the Court of Appeals. That the amendment to the Rule was not intended to affect only, or was limited to plans adopted and options granted after its effective date was made clear by the Commission release (No. 5312, May 21, 1956). The amendment was but an effectuation of the basic intention of the Rule as amended in 1950 and a clarification and simplification of it in order to abolish the prior restriction. The J & L plan at the time in question here qualified under Rule X–16b–3.

Before we consider the significance of the opinions in Greene v. Dietz, it might be well to examine the background and development of Rule X–16b–3, which evidences a continuous broadening of exemption from the stricture of Section 16(b).

In 1935, when the Rule was first promulgated it applied only to *non-transferable options* granted and purchases made prior to June 6, 1934 in connection with an employment contract (SEC Release No. 5312, May 21, 1956); in 1949, it was substantially changed and broadened to encompass *securities acquired* by corporate officials as compensation under a bonus, profit-sharing, retirement or similar plan, so long as the securities were issued for services, their aggregate amount was limited to a percentage of the net profits and no cash was paid for them (SEC Rel. 4216, 4253, 2/25 and 5/6/49). This amendment did not deal with options at all but only with acqui-

sition of securities "issued to directors and officers as a part of their remuneration."

Then, in 1952, the Rule was again amended to cover *restricted stock option plans* which met the same standards as the rule prescribed for bonus plans above. This amendment was to enable optionees to take advantage of the favorable tax treatment accorded these plans under certain conditions by the passage of Sec. 130A, Internal Revenue Act of 1950, 26 U.S.C.A. § 130A; now Secs. 401, 404 and 421, I.R.A.1954, 26 U.S.C.A. §§ 401, 404, 421. Its purpose was to "broaden the exemption hitherto provided for by the rule by making it applicable to *acquisitions* of non-transferable *options,* as well as to *acquisitions* of shares of *stock*" (Release No. 4754, 9/24/52). To accomplish this the Rule eliminated the requirement that such options be acquired as part of remuneration for services by permitting the payment of cash pursuant to the option contract. Finally, on May 29, 1956, the Rule was further "clarified" to codify the interpretations rendered by the Commission in the interim and "to simplify the provisions and reinforce the investor protections." Specifically, to the phrase "any acquisition of non-transferable options or of shares stock" were added the words: "including stock acquired pursuant to such options"—making it clear that the exemption also applied to *acquisition of stock pursuant to non-transferable options.* The provisions dealing with ineligibility to participate by Committee members selecting the optionees and with the payment of cash were completely eliminated.

The purpose of the Commission in enacting the 1956 revision was not to change the meaning and scope of the rule but to effectuate its basic intention of exempting acquisitions pursuant to both bonus and similar plans and restricted stock option plans favorably treated by the Revenue Act of 1950. In the opinion of the Commission, the clarification of the Rule seemed urgent and desirable "so long as the public interest was not prejudiced" (Release No. 5291 3/22/56).

It is clear that the Rule in its present form is the result of deliberate action taken by the Commission over at least a year after public notice, releases describing the proposed changes, invitations to submit views and comments which were available for public inspection and after analysis and review of the comments received.

In effect, what the Rule does is to carve out of the word "purchase" in Section 16(b) an *acquisition* of restricted option stock, so that a purchase and sale, and the converse, of such stock within 6 months is exempt; but it does not take out of the statute a *sale* of option stock so that such sale may be matched up for Section 16(b) purposes with a purchase of non-option stock. It does not exempt acquisitions of option stock from the monthly reporting requirements of changes in ownership of Section 16(a), nor does it exempt management from reporting annually in its proxy statement all details of the granting and exercise of options including price, market value and securities affected, or exempt the seller from complying with the provisions respecting ownership contained in Section 16(c).

We turn now to Greene v. Dietz. Although the Rule under construction there was the predecessor Section 16b–3, (the 1952 version) the same principles are applicable to the 1956 versions. (See discussion ante; Release No. 5312, supra).

In holding that Rule X–16B–3 as promulgated was within the power and authority of the Commission the trial court in Greene v. Dietz cited Smolowe v. Delendo Corp., 2 Cir., 1943, 136 F.2d 231, 148 A.L.R. 300, certiorari denied 1943, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446, as authority for the valid delegation of power to the Commission by Congress; it also pointed to the fact that the acquisition price of the stock was fixed, thus, to its thinking, removing the evil of shortswing, and concluded that the determination of the Commission entitled to great respect was not to be lightly

overturned, but that "whether the regulations were within the power of the Commission or not," (143 F.Supp. at page 473) no liability could be imposed because defendant had acted in reliance of it. Judge Dawson in addition however did make an express finding of validity.

Judge Waterman, adopting the lower court's decision that the plan there in suit came within the Rule, commented on the conclusion as to its validity in these words:

> "We do not find it necessary to adopt this portion of the opinion below in order to affirm the trial court. Indeed, although not essential to our opinion, we express doubt as to the power of the Commission to promulgate Rule X–16B–3 inasmuch as the Rule's broad language may permit acts by insiders sought to be prevented by the Securities Exchange Act. Nor do we regard the promulgation of the Rule as a matter solely within the expertise of the SEC and therefore beyond the scope of judicial review." 247 F.2d 692.

He then discussed the potential evil of the rule and posed the problem as being that of defining the power of the Commission "to promulgate a regulation that may permit an abuse sought to be eliminated by section 16(b) of the very Act of Congress that created the Commission for the purpose of enforcing that Act." (247 F.2d 694)

The Court of Appeals concluded by affirming the trial court on the issue of defendant's good faith and exculpability under Section 23(a).

Judge Clark concurred separately in Judge Waterman's "expression of doubt as to the power" of the Commission when viewed against the Congressional purpose of the statute as declared in Smolowe v. Delendo, supra.

Judge Lumbard, concurring in the result reached, dissented from so much of the opinion as expressed doubt of validity and agreed with Judge Dawson that the Rule was valid and that any doubt should be resolved in accord with the expert judgment of the Commission (247 F. 2d at page 696).

Those three opinions were filed on June 7, 1957; on August 12, 1957, a petition for rehearing filed by the Commission alone (who had not formerly intervened) "to remove any uncertainties with respect to our beliefs as to the validity of SEC Rule X–16b–3," was denied per curiam, (247 F.2d 697) in the following language:

> "The petition and brief demonstrates that the Securities and Exchange Commission understands, without further clarification, the content of our opinion. We learn therefrom that it is reevaluating its Rule X–16b–3. In the meantime, pending any modification of the Rule after such re-evaluation, it would seem that any reliance upon it by persons entitled to exercise stock purchase options under employee stock option plans substantially similar to that there in issue would be ill-advised."

Again Judge Lumbard dissented: (247 F.2d 697)

> " * * * we should hold Rule X–16b–3 to be valid * * * the majority's doubts as to its invalidity, which really amount to a holding of invalidity, should be based on more than a possibility of abuse as supposed and conjectured by judges."

Agreeing with the Commission that the Court's approach nullified its rule-making power, Judge Lumbard concluded that a "decent respect for the powers and duties of an administrative agency should impel us to exercise our powers—here the power of a dictum—with some humility and self-restraint." 247 F.2d at page 698.

The question of the validity of Rule–16b–3 was thoroughly briefed by the parties and squarely presented to the Court of Appeals. It is obvious from the language of the opinion that the problem was weighed and considered and that there was "application of the judicial mind to the precise question" (Carroll

v. Carroll's Lessee, 16 How. 275, 57 U.S. 275, 286–287, 14 L.Ed. 936). Mutual Benefit Health & Accident Ass'n v. Bowman, 8 Cir., 99 F.2d 856; 304 U.S. 549, 58 S.Ct. 1056, 82 L.Ed. 1521, certiorari denied 306 U.S. 637, 59 S.Ct. 485, 83 L. Ed. 1038. Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759; Eisner v. Macomber, 252 U. S. 189, 40 S.Ct. 189, 64 L.Ed. 521; Fix Fuel & Material Co. v. Wabash R. Co., 8 Cir., 243 F.2d 110.

The introductory expression of doubt of the Court followed by discussion of Congressional purpose and of Section 16(b) and concluding with the paragraph "However, we believe the following sequence of events justifies an affirmance" (247 F.2d 694) logically and rhetorically presupposes a prior determination of invalidity, or the question of good faith would not have been reached. Had this aspect of good faith been absent from the case we feel quite sure that the judgment would have been reversed. Under this interpretation the question was essential to the final determination. It seems, however, that in order to give the Commission an opportunity to bring its rule in line with Congressional intent—as is disclosed by the per curiam opinion on the rehearing—the Court deliberately refrained from an unequivocal declaration of invalidity (which philosophically it had reached) and expressed doubt on the matter, while warning against future reliance on the rule as ill-advised.

The situation here is not that which was presented to the Court in Union Pacific R. Co. v. Mason City & Ft. D. R. Co., 199 U.S. 160, 166, 26 S.Ct. 19, 20, 50 L.Ed. 134, when it was written that "where there are two grounds, upon either of which the judgment of trial court can be rested, and the appellate court sustains both, the ruling on neither is *obiter*, but each is the judgment of the court, and of equal validity with the other." Here only one of the alternate grounds upon which the judgment of the lower court rested was sustained, and by doing so the appellate court impliedly found that the other ground could not support the judgment, but on the contrary would have compelled an opposite result. Commonwealth of Massachusetts v. United States, 333 U.S. 611, 68 S.Ct. 747, 92 L.Ed. 968; United States v. Title Ins. & Trust Co., 265 U.S. 472, 44 S.Ct. 621, 68 L.Ed. 1110; Choctaw Nation v. United States, 135 F.Supp. 536, 133 Ct. Cl. 207, certiorari denied 352 U.S. 825, 77 S.Ct. 36, 1 L.Ed.2d 48.

To our knowledge only two courts have had occasion to consider the effect of Greene v. Dietz, and both have accepted it as dictum. In Gruber v. Chesapeake & Ohio Ry. Co., D.C., 158 F.Supp. 593, the District Court for the Northern District of Ohio while mentioning the Court of Appeals' expression of doubt followed Judge Dawson's holding of validity. In Emerson Electric Mfg. Co. v. O'Neill, D. C., 168 F.Supp. 804, the District Court for the Eastern District of Missouri absolved the defendants from liability on the ground of good faith finding that they were ignorant of the "dictum" of the Court of Appeals in Greene v. Dietz.

I conclude that although the logical effect of the expression of doubt of the Court of Appeals for practical purposes is that of a holding, it was deliberately given the status of a judicial dictum by the Court uttering it; dictum "rests upon a quite solid foundation" (United States v. Ellis, 2 Cir., 264 F.2d 325), which while of great significance and entitled to this Court's respect does not preclude the parties from urging anew the validity of the Rule or the good faith reliance of the defendant, or this Court from reaching its own decision after independent consideration and study of the question.

In order to effect its broad and comprehensive program of insuring the maintenance of fair and honest markets, the SEC of 1934 set out to regulate the stock transactions of officers, directors and large security holders by enacting Section 16. Much has been written in this Circuit concerning the purpose of Subdivision b, in particular, since its first expression by Judge Clark—that it

was "to establish a standard so high as to prevent any conflict between the selfish interest of a fiduciary officer, director, or stockholder and the faithful performance of his duty" (Smolowe v. Delendo Corp., supra, 136 F.2d at page 239)—that it is unnecessary for this Court to belabor that point.

To achieve the fulfilment of this purpose, federal courts have brushed aside obstacles raised in a stockholder's path: they have refused to consider the insider's good faith and actual use of inside information, or the total absence of interest of the stockholder in the corporation at the time of the transaction, or the full approval of the corporation to the transaction. The award of counsel fees as a motive for the institution of suit has not been considered as affecting the merits of these suits. It has been recognized that in safeguarding the paramount interest of the investing public the corporation is often "the instrument, sometimes unwilling, for the effectuation of the statutory policy" (Magida v. Continental Can Co., 2 Cir., 1956, 231 F. 2d 843, 846, 847, certiorari denied 351 U.S. 972, 76 S.Ct. 1031, 100 L.Ed. 1490) and the stockholder the "mere vehicle of recovery" (231 F.2d at page 848); (Smolowe v. Delendo, supra; Pellegrino v. Nesbit, 9 Cir., 203 F.2d 463, 37 A.L.R. 2d 1296).

To enforce the Act effectively and wisely, Congress created the SEC and clothed it with power to make "such rules and regulations as may be necessary for the execution of the functions vested" in it (Section 23(a)), because it was presumed to be possessed of more expertise and available information than the courts. The execution of its function is the carrying out of the legislative intent as it is clearly expressed in the statute (Smolowe v. Delendo; Greene v. Dietz).

■ However, the terms of the Act are not so large or so loose as to require for their construction "a distinct and profound exercise of discretion" which this Court would be loath to review and disturb, nor is "the decision to act or not to act left to the expertise of the agency burdened with the responsibility for decision" (Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 318, 78 S.Ct. 752, 757, 2 L.Ed.2d 788). The enforcement of Section 16(b) is left to the courts not to the Commission. Roberts v. Eaton, 2 Cir., 1954, 212 F.2d 82, certiorari denied 348 U.S. 827, 75 S.Ct. 44, 99 L.Ed. 652. See also Vacheron & Constantin-Le Coultre Watches, Inc. v. Benrus Watch Co., 2 Cir., 260 F.2d 637; Helvering v. Wilshire Oil Co., 308 U.S. 90, 60 S.Ct. 18, 84 L.Ed. 101.

■ So long as the Court finds that the Commission, however inexpertly or imperfectly, is effectuating the intent of the statute and that its regulations, however burdensome, are so directed, within statutory and constitutional limits it may not substitute its judgment for the more informed and expert judgment of the Commission or pronounce upon its wisdom for it according to the accepted fanciful notions has neither the technical competence nor legal authority to do so (Board of Trade of Kansas City, Mo. v. United States, 314 U.S. 534, 62 S.Ct. 366, 86 L.Ed. 432; Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. 724; Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; S. E. C. v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995; S. E. C. v. Central-Illinois Securities Corp., 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836; National Broadcasting Co. v. United States, 319 U.S. 190, 63 S. Ct. 997, 87 L.Ed. 1344; American Tel. & Tel. Co. v. United States, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142). On the other hand, judicial review and action may always be had when the statutory and constitutional authority for the Commission's action is absent and when it has abused its powers—which is the charge made here (Trust of Bingham v. Commissioner, 325 U.S. 365, 65 S.Ct. 1232, 89 L.Ed. 1670).

The Commission's authority was narrowly circumscribed by Congress in this field and it was to be guided by the statutory exemptions found in the Act in promulgating regulations and rules.

There was left to the exercise of its discretion only those cases where relief from hardship under the statute was called for; this was pointed out in Smolowe v. Delendo, supra and in the Commission's Release No. 4509, October 30, 1950, where it recognized that its power to exempt existed only in "hardships outside the statutory purpose." See also, Wright v. S. E. C., 2 Cir., 112 F.2d 89.

A reminder of the necessity of faithful adherence to Congressional purpose of the Act is found in all the sections dealing with the Commission's powers. Under Sec. 3(a) (12) the Commission is given power to exempt securities when "necessary or appropriate in the public interest or for the protection of investors"; under Section 3(b) to define technical, trade and accounting terms "insofar as such definitions are not inconsistent with the provisions of this title"; and under Section 16(b) to exempt transactions "as not comprehended within the purpose of this subsection", Section 23 (a) contemplates the event that regulatory action of the Commission might be stricken down as invalid by "judicial authority."

With this interpretation of the Commission's authority, it cannot logically be found as defendants argue that the Commission has quasi legislative discretion to lift out of the stricture of the statute a transaction which factually falls within it; rather, it follows that the Commission may only, because it is presumed in a better position to do so, make a factual determination that a particular transaction does or does not correspond with the facts enumerated in the statute and make a declaration of exemption on that ground. In other words, if we are to be faithful to the Congressional purpose as clearly expressed, the only meaning which we may give the words "as not comprehended within the purpose" is "if not comprehended"—the "if" to be determined by the Commission.

On its face the statute makes no distinction between stock purchased by the insiders in the market and stock purchased by them under option agreements.

It is necessary then to determine whether any of elements of Section 16(b) is missing from the transactions under consideration in order to justify exemption.

The exemptions found in Section 16 (b) illustrate that this is the test to be applied: in the first—the case of a good faith stock acquisition in connection with a prior debt,—the element of voluntary purchase is absent, and in the second,— where the beneficial owner was not such both at time of purchase and of sale—the element of ownership at one of the critical times is absent (Cf. Adler v. Klawans, D.C.S.D.N.Y., 172 F.Supp. 502).

In an attempt to meet the statutory standard the Commission and defendants make interrelated arguments. The Commission urges that since the purchase price for the stock in question was fixed in 1953—when the option was granted— and the option was not exercisable for at least one year (and here in fact was not exercised for almost four years) any profit resulting from the sale or purchase was derived from the increase in the market value occurring during this entire period of four years rather than from the shorter period between the sale and purchase. The defendants urge that the exercise of the option was not a purchase within the intendment of the statute but rather was an acquisition incident to and related to employment calculated to furnish incentive and secure continuity of employment, and that the opportunity for shortswing is absent because the insider has no control over the acquisition price—and because in any case where a sale precedes the acquisition of option stock since the price was fixed—the profit will remain the same whether he wait one month or one year after a sale to acquire the option stock.

In the first place, although as a practical matter a waiting period between grant and exercise of the option is found in these plans, Rule X–16b–3 contains no such waiting requirement so that at least in theory there is nothing in the Rule precluding a shortswing transaction.

Then too, we must be mindful of the fact that in the option in suit, while the price is fixed in advance (and to that extent the insider has no control over it), the option may not be exercised at the time the price is fixed or for a year thereafter. There is no requirement that the option ever be taken up so that when an optionee does exercise his option and sells or buys within six months, it is unrealistic for purposes of computing the time within which the transactions took place to look back to a period of time when he had no ownership in the stock and no duty to acquire any.

We must also note that under this option in suit, the stock was not a form of compensation payable to an insider regardless of his own decision and will; it was not an allotment for services performed (Cf. Truncale v. Blumberg, D.C., 88 F.Supp. 677, affirmed Truncale v. Scully, 2 Cir., 182 F.2d 1021). The optionee is given an election to exercise his right in whole or in part upon the payment of a fixed amount any time within 8 years, or not at all. It is this element of choice on the part of the insider to acquire or not, as he sees fit, that characterizes his acquisition a purchase within 16(b). Steinberg v. Sharpe, D.C., 95 F.Supp. 32; Roberts v. Eaton, supra; Shaw v. Dreyfus, 2 Cir., 172 F.2d 140, certiorari denied 337 U.S. 907, 69 S.Ct. 1048, 93 L. Ed. 1719; Blau v. Mission Corp., 2 Cir., 212 F.2d 77. Even a "voluntary conversion" and an "option to dissent" from a plan and receive cash have been held purchases within the statute. Park & Tilford v. Schulte, 2 Cir., 160 F.2d 984, 987, certiorari denied 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347; Blau v. Hodgkinson, D. C., 100 F.Supp. 361.

When the insider does decide to sell after exercising his option, any profit he makes is not the result of natural increases in the market over which he has had no control. It is the product of "market activity" engaged in by him, since it is he who determines the time and the conditions under which he will acquire the stock and the ultimate profit to be made. Truncale v. Blumberg, supra. Herein lies the incentive value of these options. Greene v. Dietz, 2 Cir., 247 F.2d 689. As Judge Medina pointed out in Steinberg v. Sharpe (95 F.Supp. at page 33–34) in discussing the cost to be attributed to a security on the date of its acquisition " * * * an officer could utilize such grants as a means to circumvent the provisions and subvert the purposes of § 16(b), merely by deferring the exercise of options because he anticipated an increase in the value of the stock on the basis of some inside information; when that increase had occurred, he could exercise the option and sell the stock obtained thereby while the market for the stock remained high * * * it is clear that a 'profit' would, in fact, have been obtained as the result of inside information."

It is the choice on the part of the insider which gives him the opportunity to act in reliance on inside information as compared with the absence of such choice in the annual award plans which were considered in Truncale v. Blumberg, but it is significant that even there it was assumed that the transaction came within 16(b) (this was prior to Rule 16b–3) and the hardship resulting from the application of the statute was relieved by the Court through application of a different rule of damages under the statute. See also Shaw v. Dreyfus, supra, 172 F. 2d 140—dissent Clark, J., at page 143.

It is difficult to see how the opportunity for shortswing profits, present when the insider equipped with inside information goes out into the market and buys, vanishes because armed with the same information, he goes to the corporation and buys that which he is under no obligation to buy. We can see no logical or practical difference in the two situations.

These are far from isolated transactions and herein lies the real evil. The widespread use of these options to the favored classes in possession of information not available to other stockholders and as a matter of fact initiated by these very individuals (last amendment to Rule eliminating eligibility provisions) constitutes a gratuitous preference to that very

class which Congress thought were most in need of regulation, in an area which was one of the moving forces for the enactment of 16(b) (Senate Rep. Nos. 1455, pp. 55–63; 792, pp. 7–9; H.Rep. 1383, pp. 10, 13–14; 73rd Cong. 2nd Sess.)

"Section 16(b) became law following a Congressional investigation which showed unhealthy, if not unconscionable, dealings between officers and directors of a corporation * * * to the officers and directors. One of the purposes of Section 16 (b) was to prevent these questionable transactions between insiders among themselves to the possible detriment of the minority shareholders and the public in general."

Jefferson Lake Sulphur Co. v. Walet, D.C., 104 F.Supp. 20, 23, affirmed 5 Cir., 202 F.2d 433, certiorari denied 346 U.S. 820, 74 S.Ct. 35, 98 L.Ed. 346.

While it is true that these options are surrounded by safeguards absent in the old condemned type of options, the opportunity for quick profit taking at a relatively risk free investment is just as real. Thus, the limitation on the number of shares permitted to be acquired under the Rule merely sets a maximum of possible profit; the statute is designed to "squeeze all possible profits" (Smolowe v. Delendo; Park & Tilford v. Shulte, supra; Gratz v. Claughton, 2 Cir., 187 F.2d 46).

■ Formal Stockholder approval of the plan does not dissipate unfairness (Magida v. Continental Can Co., supra; Jefferson Lake Sulphur Co. v. Walet, supra); and, "investor protection" (Rel. No. 5312, 5/21/56) is not reinforced by full disclosure under Section 16(a) after the profit has been made other than to make possible the bringing of suit under Section 16(b).

Section 421, 26 I.R.C., renders improbable the sale of stock so acquired before six months have elapsed, but it does not preclude a quick profit from the sale of other prior acquired stock—the situation here. Moreover, as the Court of Appeals

pointed out in Greene v. Dietz, supra, the possible inhibiting effect of tax provisions upon the security transactions of insiders is a matter completely apart from that of defining the power of SEC and the validity of a Rule which contains no such inhibitions. See also Blau v. Mission Corp., 2 Cir., 1954, 212 F.2d 77, 80; Smolowe v. Delendo; Truncale v. Blumberg. And the fact that Congress has encouraged these plans by conferring tax benefits on them (Senate Rep. No. 2375, 81st Cong. 2nd Sess. 59 (1950) does not mean that it intended to immunize them from their less favorable aspects.

Aside from the argument that these plans serve the public and the stockholder interest by providing good corporate management and of this we have no doubt (Gruber v. Chesapeake & Ohio Ry. Co., supra), neither the Commission nor the defendants have advanced any equitable or compelling reasons which would justify finding the balance between business necessity and potential abuse in favor of the exemption (S.E.C. v. Sunbeam Gold Mines Co., 9 Cir., 95 F.2d 699).

■ What started out as a rule to relieve from hardship has by constant expansion resulted in a pro tanto repeal of Section 16–b with respect to restricted option stock. (Cook and Feldman—Insider Trading under the S.E.A.—66 Harv.L.Rev. 633, Loss, Securities Regulation 573). Such repeal by implication, regulation or judicial inventiveness is not favored, especially on so important a piece of legislation which is being so vigorously enforced (A. H. Bull S. S. Co. v. Seafarers' Intern. Union of North America, 2 Cir., 250 F.2d 326, 330).

One more observation might be made in answer to the cry that a holding of invalidity renders these plans worthless, —and this is the significant fact that the J & L plan was set up 5 years and Timberlake was given his option 3 years prior to the final amendment to the Rule exempting the stock acquired under the plan from the statute (see Ex. 8—letter dated 6/1/56 from vice-president of J & L in charge of legal affairs to optionees).

Apparently, the opportunity to buy low and sell when the market price of the security had gone up was considered sufficient executive incentive to justify the J & L plan in 1951. As for the Commission, in 1950 it recognized the necessity for requiring the holding of option stock for 6 months before disposing of it and the need of relief from this rule only in cases of hardship "outside the statutory purpose" (Release No. 4509) which is clearly not the case here (Greene v. Dietz, supra).

Acutely aware as we are of the energetic and diligent enforcement of the S. E. A. of 1934 by the Commission, we reluctantly conclude that in enacting Rule X–16b–3, the Commission "attempted to clear a narrow path of immunity through the mine field of insider temptations",— precisely what Congress declined to do when it fixed liability irrespective of good faith and motive (43 Va.L.Rev. 1314), and that such an attempt is beyond the power of the Commission. Trust of Bingham v. Commissioner, supra; 57 Col.L.Rev. 1177.

■ We hold that Rule X–16b–3 is in conflict with the expressed purpose of the statute and therefore invalid.

Having concluded that the Rule is invalid, we reach the question of defendant's exculpation from liability for the profit he made on the 1,800 shares of stock by reason of Section 23(a).

It has been stipulated that Timberlake received and in fact in good faith relied upon the communication from J & L counsel advising him on June 1, 1956, that Rule X–16b–3 had been amended to include acquisitions of stock under his option within the exemption of the Rule; and on the Rule when he sold and acquired the stock in question between April 9, 1957 and July 16, 1957, unless the opinions of the Court of Appeals of June 7, 1957 as a matter of law preclude such good faith reliance or unless the facts preclude the finding of such good faith.

Section 23(a) comes into play only where after an act has been done or omit-

ted there has been a determination of invalidity by "judicial or other authority". It is only then that the necessity of establishing good faith reliance on the part of the insider comes into play.

■ Presumably, if the Rule has been invalidated prior to the act or omission there can be no "good faith in conformity" with it regardless of knowledge on the part of the individual claiming such reliance and Section 23(a) will not avail him. The purpose of the Section is to permit regulations to protect persons who rely on them while they remain valid, in the absence of "judicial or other authority" to the contrary.

We have concluded that the Rule had not been determined by judicial authority to be invalid on June 7, 1957 when the first opinions in Greene v. Dietz were filed; therefore Timberlake, when he exercised his option was not as matter of law precluded from relying on the Rule.

This brings us to the second opinions of August 16, 1957, which followed the exercise of the option by Timberlake. Here, again, we have concluded that there was no judicial authority invalidating the rule on that date. However, assuming that for purposes of determining good faith reliance on the rule, the caveat issued by the Court on that day amounted to a "holding of invalidity" (as Judge Lumbard phrased it in his dissent and the Commission in its brief on the rehearing), bringing it within Section 23 (a) we hold that his "good faith in conformity" with the rule cannot be doubted in the face of the stipulated facts.

A year prior to the exercise of his options, Timberlake had been actually notified by a letter from the vice-president in charge of legal affairs addressed to all the officers, including defendant, of the amendment and of the fact that by virtue of the amended Rule he was free to purchase stock under his stock options at any time and that it was no longer necessary for him to delay such a purchase until more than six months after his last sale of common stock. A year later at the moment of purchasing the stock,

Timberlake had inquired of Wunderlich, who was in charge of administering the plan, as to whether he would incur any liability in view of his two recent sales of stock and was advised that because of Rule X–16b–3 he would not.

It is unquestioned that neither knew of the Greene v. Dietz opinions then and did not learn of them until August 16, 1957 when a memorandum advising them of the opinion was sent by the Assistant General Counsel, the only officer who at the time of the exercise of the option had knowledge of the opinions but had not reported them to anyone.

In addition, defendant Timberlake was a resident of Pennsylvania and was actually there on the dates he purchased the stock at the Pittsburgh offices of J & L; he was not in New York at any of the times in question, and nothing came to his attention which might have put him on inquiry. He did all that was reasonable. It is clear that but for the information he received from persons on whose opinion he was justified in relying that the rule had been amended and that it exempted his dealings and that because of the Rule his two sales would not affect his purchase, Timberlake would not have acted as he did. By reason of his reliance on the rule he is not required to account for the profits of $56,132.74 derived from his acquisition of 1,800 shares of option stock on July 16, 1957 (Greene v. Dietz, supra; Lockheed Aircraft Corp. v. Rathman, D.C., 106 F.Supp. 810; Emerson Electric Mfg. Co. v. O'Neill, supra).

Because of this determination, it is unnecessary to consider the validity of Rule X–16b–6 or its applicability to these options (Cf. Steinberg v. Sharpe, Shaw v. Dreyfus, dissent; Emerson Electric Mfg. Co. v. O'Neill, supra); or the questionable capacity of defendant J & L to interpose a counterclaim for a declaratory judgment of validity (Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230; Boston Tow Boat Co. v. United States, 321 U.S. 632, 64 S.Ct. 776, 88 L.Ed. 975).

Defendants' motions for summary judgment dismissing the complaint are granted; defendant's J & L motion for judgment on the counterclaim is denied. The Clerk is directed to forthwith enter judgment dismissing the complaint upon the merits. So ordered.