ISLAND GAS, INC., PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61047. Filed June 30, 1958.

*Richard B. Clausing, Esq.*, and *Ira Houghton, C. P. A.*, for the petitioner.

*Hunter D. Heggie, Esq.*, for the respondent.

HARRON, *Judge:* The Commissioner determined deficiencies in income tax for the years 1951, 1952, and 1953 in the respective amounts of $6,938.63, $2,352.64, and $748.38. The year 1950 is involved because petitioner claims a deduction in 1950, which if allowed results in a net operating loss for 1950 which petitioner would be entitled to carry over to the taxable years.

The issues to be decided involve the provisions of section 24 (c) of the 1939 Code, which the respondent has determined bar deduction in 1950 of intangible development costs of gas wells in the amount of $132,626.77, and the deduction in 1951 of interest in the amount of $6,277.43. Whether or not respondent's determinations are correct depend upon the decision of several questions which are stated hereinafter.

### FINDINGS OF FACT.

Petitioner filed its returns for the taxable years with the collector, or district director, of internal revenue at Wichita for the district of Kansas. Petitioner keeps its books and files its returns on an accrual basis.

Petitioner was organized under the laws of Kansas on October 12, 1949. Its principal place of business is located in Wichita. Petitioner's authorized stock consists of 740 shares of preferred stock of a par value of $100 per share, and 100 shares of common stock of a par value of $10 per share. None of the preferred stock was issued. All of the common stock was issued.

Petitioner was organized by Harry Pope, Charlie Hinton, and Rebecca Sheehand, hereinafter called the organizers, for the purpose of drilling gas wells under gas leases to be obtained under a "farmout" agreement with Stanolind Oil and Gas Company. The organizers of petitioner knew that the leases and the agreement could be obtained covering acreage in the Hugoton gas field in Kansas sufficient to form 9 blocks of 640 acres each on which 9 gas wells could be drilled. However, the organizers were not drilling contractors and they did not have the capital required to drill and equip 9 gas wells and it was necessary for them to make arrangements under which the gas wells could be drilled. Accordingly, the organizers approached Walter Kuhn in Wichita, who is a drilling contractor

and a producer of gas and oil, before they arranged for a contract between Stanolind and petitioner and for assignments of gas leases to petitioner. Petitioner's organizers asked Kuhn if he would drill gas wells on the property to which they expected petitioner would obtain leases, and if he could obtain the required capital to drill the wells. For his assistance, petitioner's organizers proposed that petitioner would assign Kuhn a 25 per cent working interest in the gas leases and gas wells. Kuhn agreed to go along with the entire proposal of Pope, Hinton, and Sheehand. Kuhn had credit at banks which would enable him to borrow the needed funds. Neither Pope, Hinton, nor Sheehand were related to Kuhn.

On December 14, 1949, the farm-out contract was executed between Stanolind and petitioner under which Stanolind assigned 9 gas leases to petitioner. Under the contract, Stanolind retained its overriding interest in the leases which entitled it to stated payments out of the production of gas. Also, under the contract petitioner, Island Gas, Inc., agreed to drill and complete a total of 9 gas wells, 4 of which were to be in production 60 days from the date of the contract, and 5 were to be in production by July 1, 1950. The drilling and completing of the 9 gas wells were to be at the expense of Island Gas. The contract with Stanolind is lengthy; it imposed many covenants and obligations upon Island Gas.

Prior to December 14, 1949, the organizers of Island Gas proceeded to have all of its common stock, 100 shares, issued, and to put Island Gas in readiness to enter into the above farm-out contract with Stanolind and to proceed with the drilling of gas wells under the contract. Kuhn paid $1,000 into the treasury of Island Gas for 100 shares of its common stock which were made out in his name. However, 5 shares of stock were qualifying shares and those were not delivered to him. There was delivery of 95 shares of the common stock to Kuhn. At all times, Kuhn was listed in the stock record book of Island Gas as the owner of 95 per cent of the common stock. The common stock is voting stock. Kuhn was made president of Island Gas.

On December 14, 1949, at the same time the contract with Stanolind was executed by petitioner, petitioner executed three individual option contracts with each of its organizers (who are also referred to by the parties as lease brokers), Pope, Hinton, and Sheehand, under which petitioner gave each a sole and exclusive option to purchase a stated number of shares of petitioner's common stock for $10 per share. The exclusive option was good until January 1, 1956. It was contemplated that petitioner would have paid all of its indebtedness by January 1, 1956. Under the option agreements, petitioner covenanted that it would not sell any portion of its interest in the gas leases, or in the gas wells, until all of its indebtedness was paid, and in no event, not prior to January 1, 1956. It was provided, further, that before delivery of

any of petitioner's common stock would be made to an optionee, such optionee would pay to petitioner a sum of money equal to the indebtedness of petitioner which could be assessed against the number of shares of stock on which an option was exercised. Each option contract was to remain in effect until January 1, 1956, and it could be extended by mutual agreement for annual periods thereafter. Under the three option agreements, petitioner's organizers were given options to purchase 100 per cent of petitioner's common stock.

The option contracts were in effect when 95 per cent of petitioner's common stock was issued in the name of Kuhn and delivered to him. The issuance and delivery of shares of petitioner's common stock to Kuhn was subject to the above options.

Pursuant to the earlier understanding between the organizers of petitioner and Kuhn, petitioner, on December 15, 1949, assigned to Kuhn an undivided 25 per cent interest in the 9 gas leases assigned to petitioner under the farm-out contract with Stanolind Oil and Gas Company. This assignment left in Island Gas a 75 per cent working interest in the gas leases, and gave Kuhn a 25 per cent working interest therein.

On January 18, 1950, Kuhn entered into a contract with Island Gas which was both a drilling contract and a contract covering other matters. Under this contract Kuhn agreed to drill and equip, ready for pipeline connection, 9 wells on the property leased to petitioner. Petitioner agreed that its share of the cost of drilling and equipping each well would be $19,500, or $175,500 for its 75 per cent interest in 9 gas wells. It was further agreed that Kuhn would operate the 9 wells, maintain all records for Island Gas, and file all tax returns, for which services Island Gas agreed to pay Kuhn $25 per well per month for operating each well, plus $100 per month for Kuhn's overhead and accounting. It was further agreed that Island Gas would pay Kuhn 4 per cent interest per annum on the unpaid balance of sums owing to him on the first day of each month.

It is customary for a corporation to contract with an individual to have such person operate gas wells after they go into production.

Under the contract of January 18, 1950, it was contemplated that Kuhn was to be paid for both debts of petitioner due him and his charges for services, by Island Gas out of proceeds which it derived from sales of gas, which were its only sources of income.

Under the option agreements of December 14, 1949, it was contemplated that petitioner's organizers would purchase all of petitioner's common stock after all of petitioner's indebtedness to Kuhn was paid, unless they made payment for the part of such indebtedness as would be assessed against shares of stock, if they (or any one of them) elected to exercise an option to purchase petitioner's stock before all indebtedness to Kuhn had been paid.

All of the various agreements having been executed by January 18, 1950, Kuhn proceeded thereafter to arrange for the drilling of the 9 wells. He borrowed in excess of $175,500 from a bank for which loan he gave the bank a mortgage on the 9 gas leases. Also, he gave the bank his personal note.

The petitioner received $175,500 out of all of the sum which was loaned by the bank. Petitioner borrowed $175,500 through Kuhn. Kuhn repaid the loan to the bank at sometime in 1951. Petitioner could not repay its debt for $175,500 by 1951 because it could repay the debt only out of the proceeds it obtained from the sales of gas which the wells produced. Kuhn agreed with petitioner that the loan of $175,500 could be repaid to him, each year, as petitioner realized receipts from sales of gas.

The 9 wells were drilled and fully completed by Kuhn, under his drilling contract with petitioner, by August of 1950. As stated above, petitioner's 75 per cent share of the drilling costs was $175,500 or $19,500 per well.

Each of the 9 wells was productive and produced gas in commercial quantities.

The interest which accrued in 1950 and 1951 on petitioner's indebtedness to Kuhn amounted to $6,110, and $6,277.43, respectively. Petitioner did not pay any of the interest which accrued in 1950 and 1951 during 1950 or 1951, or at any time within 2½ months after the end of 1950 and 1951. The above accrued interest had not been paid to Kuhn prior to December 31, 1953.

Petitioner accrued in 1950 the total contract price of the 9 wells, namely $175,500, and it made payment of the accrued cost in that amount by paying $175,500 to the drilling contractor, Kuhn. Petitioner made payment to the drilling contractor by the use of funds which were first borrowed by petitioner and were then disbursed by petitioner to the drilling contractor, Kuhn.

Of petitioner's total cost for the drilling and equipping of the 9 wells, $139,327.30 was allocated to the intangible drilling and development costs, and $36,172.70 was allocated to the costs of equipment. The Commissioner does not question the above allocation.

Petitioner, in its income tax return for 1950, elected to exercise the option given to taxpayers in section 29.23 (m)–16 of Regulations 111 to deduct from gross income as an expense intangible and development costs rather than charge them to a capital account, and, accordingly it deducted $139,327.30 from gross income.

From December 23, 1950, through December 31, 1953, petitioner paid in installments, out of its receipts from sales of gas, the total amount of $77,134.82 to Kuhn on his loan to petitioner in the amount of $175,500, so that at the end of 1953, there was a balance owing on that debt in the amount of $98,365.18. After the end of 1953, petitioner

continued making payments on the debt. As of about April 1, 1957, petitioner had repaid almost all of the debt, there being at that time only about $13,000 remaining unpaid.

Petitioner paid Kuhn on his loan of $175,500 to petitioner, $6,000 on December 23, 1950, $6,000 on March 2, 1951, and $6,000 on April 25, 1951. Under a theory of respondent, if the above payments were to be apportioned to payments on the cost of the 9 wells, $6,700.53 would represent intangible drilling and development costs paid by petitioner during 1950 and within 2½ months thereafter.

Kuhn kept his books and filed his returns for 1950, 1951, 1952, and 1953 on a cash basis.

Kuhn owned more than 50 per cent of petitioner's outstanding common stock during the years 1950-1953, inclusive.

Upon his audit of petitioner's return for 1950, the Commissioner took the position that petitioner did not expend during 1950 the total amount of $175,500 for its share of the costs of drilling and equipping the 9 gas wells. He adopted the theory, instead, that the periodic payments out of its receipts from the sales of gas which petitioner began making to Kuhn on December 23, 1950, and continued to make during 1951, 1952, and 1953 constituted petitioner's payment of its costs of the 9 gas wells. He determined further, that $6,700.53 represented the intangible drilling and development expense which was paid in 1950 and within 2½ months after the end of 1950 (out of $18,000 paid up to and including April 25, 1951). He determined, further, that Kuhn owned more than 50 per cent of petitioner's stock, and that therefore the provisions of section 24 (c) of the 1939 Code constituted a bar to a deduction in 1950 for intangible drilling and development costs of more than $6,700.53. Since petitioner deducted $139,327.30 from its gross income for 1950, for such expense, respondent disallowed the deduction in the amount of $132,626.77, and that disallowance wiped out petitioner's claimed net operating loss for 1950, and, therefore, eliminated the carryover to 1951, 1952, and 1953 of net operating loss from 1950. The respondent also determined that section 24 (c) barred deduction in 1950 and 1951 of interest owing to Kuhn (in the amounts set forth above) which petitioner accrued, respectively, in 1950 and 1951 but did not pay in 1950, or in 1951, or within 2½ months after the end of 1950 and 1951.

We find as stipulated, the facts which are not set forth above.

## OPINION.

The issues in this case relate to one item which petitioner, an accrual basis taxpayer, accrued in 1950, intangible development costs, and to another item, interest, which it accrued in 1951. The year

1950 is before us because decision of one issue determines whether petitioner had a net operating loss in 1950 which can be carried over to each of the succeeding years 1951, 1952, and 1953. There is no issue here about petitioner's right to carry over a 1950 net operating loss, if there was such loss in 1950.

Some of the questions to be decided involve the application of section 24 (c), 1939 Code.[1] It is clear that for a deduction to be barred by section 24 (c), "all three of the conditions set forth therein must exist," *Platt Trailer Co.*, 23 T. C. 1065, 1068. Section 24 (c) relates to unpaid expenses which have been incurred and to unpaid interest which has accrued. Section 24 (c) provides that expenses and interest cannot be deducted by a taxpayer if (1) such expense or interest is not paid within the taxable year or within 2½ months after the close of the year; and (2) if the amount of such expense or interest is not includible in the gross income of the payee for the taxable year of the payee in which the taxable year of the obligor ends, unless the expense or interest is paid, because of the method of accounting of the payee; and (3) if at the end of the taxable year of the obligor-taxpayer, or at any time within 2½ months thereafter, both the obligor-taxpayer and the payee-taxpayer are persons between whom losses would be disallowed under section 24 (b). (Footnote 1, *supra.*) If all of the above conditions exist, not some but all, an expense or interest deduction cannot be allowed.

Before considering whether section 24 (c) constitutes a bar to a deduction by petitioner in 1950 of intangible drilling and development expense in the total amount of $139,327.30, and of a deduction in 1950 and 1951 of accrued interest in the respective amounts of $6,110.00 and $6,277.43, it is advisable to decide a preliminary question, namely, whether the deduction for intangible drilling costs which petitioner seeks to deduct is a deduction which comes within either section

---

[1] SEC. 24. ITEMS NOT DEDUCTIBLE.

  (b) LOSSES FROM SALES OR EXCHANGES OF PROPERTY.—

    (1) LOSSES DISALLOWED.—In computing net income no deduction shall in any case be allowed in respect of losses from sales or exchanges of property, directly or indirectly—

     *    *    *    *    *    *    *

    (B) Except in the case of distributions in liquidation, between an individual and a corporation more than 50 per centum in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;

     *    *    *    *    *    *    *

  (c) UNPAID EXPENSES AND INTEREST.—In computing net income no deduction shall be allowed under section 23 (a), relating to expenses incurred, or under section 23 (b), relating to interest accrued—

    (1) If such expenses or interest are not paid within the taxable year or within two and one-half months after the close thereof; and

    (2) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and

    (3) If, at the close of the taxable year of the taxpayer or at any time within two and one half months thereafter, both the taxpayer and the person to whom the payment is to be made are persons between whom losses would be disallowed under section 24 (b).

23 (a), expenses, or section 23 (m), depletion. Section 24 (c) refers to the allowance of a deduction under section 23 (a). Petitioner contends that upon making an election under section 29.23 (m)–16 to deduct from gross income intangible drilling costs (rather than charge them to capital), the deduction is one which is allowed under section 23 (m) rather than section 23 (a).

Our conclusion is that petitioner's theory is not sound or in keeping with the regulation set forth in section 29.23 (m)–16 of Regulations 111. Section 23 (m) of the 1939 Code provides authority to the Commissioner to adopt rules and regulations, with the approval of the Secretary, for taking a deduction for classes of items which are described in section 23 (m). When the Commissioner adopted a regulation pursuant to such authority, his regulation, section 29.23 (m)–16, dealt with "Charges to Capital and to Expense in Case of Oil and Gas Wells," and in subsection (1) (i) thereof, his regulation deals with an option given to the taxpayer by the regulation either to deduct as an expense from gross income certain expenditures, or to charge them to a capital account. The pertinent part of section 29.23 (m)–16 of Regulations 111 is set forth in the margin.[2] The term "expense" has a well-understood meaning in accounting practice, and in the above-cited regulation it is used in opposition to the capitalization of a disbursement or accrual. In the Internal Revenue Code, the term "expense" is well understood, and a deductible expense is deductible in full. Section 23 (a) (1) (A) deals, in general, with all of the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. The above cited regulation gives a taxpayer an option to elect or deduct intangible drilling and development costs from gross income "as an expense." Petitioner, in 1950 and thereafter, was engaged in a business of producing gas from gas wells and selling gas. It elected to deduct the intangible drilling and development costs of 9 gas wells from gross income "as an expense" under the regulation. We are of the opinion that having made such election, it must be concluded that section 23 (a) (1) (A) catches the deduction, and not section 23 (m) which deals with depletion. The Commissioner has taken the same view in Revenue Ruling 170, where he stated, in part, that "it is necessary to refer to section 23 (a) (1) (A) of the Internal Revenue Code to determine when they [intangible drilling and development costs here involved as an expense]

[2] Regulations 111.
   Sec. 29.23 (m)–16. CHARGES TO CAPITAL AND TO EXPENSE IN CASE OF OIL AND GAS WELLS. * * *
   (1) Items chargeable to capital or to expense at taxpayer's option:
   (i) Option with respect to intangible drilling and development costs in general: All expenditures for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas, may, at the option of the taxpayer, be deducted from gross income as an expense or charged to capital account. Such expenditures have for convenience been termed intangible drilling and development costs. * * *

may be deducted." 1953–2 C. B. 141, 142. It follows, therefore, that the intangible drilling costs of $139,327.30 for which petitioner seeks deduction in 1950, are an expense to which section 24 (c) may apply, if conditions exist which make section 24 (c) a bar to the claimed deduction. Petitioner's contention is rejected.

*Interest.* We turn now to consideration of the applicability of section 24 (c) to the claimed deductions for interest in 1950 and 1951. Petitioner concedes that the conditions set forth in subsections (1) and (2) of section 24 (c) existed in respect to the taxable years 1950 and 1951 because petitioner did not make payment to Kuhn of the interest which had accrued on an indebtedness to him, and since he reported income on a cash basis, he did not include the interest in his gross income for 1950 or 1951. The question to be decided under this issue is whether Kuhn owned more than 50 per cent of petitioner's stock in 1950 and 1951, and at any time within 2½ months after the end of each of those years.

Petitioner contends that its three organizers were the true, or the equitable owners, of the 95 per cent of the shares of its common stock which stood in Kuhn's name and had been delivered to him, and that Kuhn held the stock only as security for repayment of his loan to petitioner for $175,500. Respondent concedes that Kuhn loaned petitioner that amount, but he argues that Kuhn was the owner of 95 per cent of petitioner's stock. We agree with respondent. The evidence establishes without any doubt that Kuhn paid $1,000 for the stock, that it was carried on the stock record book of petitioner as owned by him, and that he received delivery of the stock. Furthermore, petitioner's organizers paid nothing into petitioner's treasury when the stock was issued, or thereafter, and in order to get any of petitioner's stock (in addition to qualifying shares which we assume stood in their names), they had to exercise options and pay a stated consideration of $10 per share for petitioner's stock, at least, which was the same price Kuhn had paid. Also, there was a practical reason why Kuhn had to own petitioner's stock in a controlling amount. He had to borrow the money needed to drill the 9 wells, and although the bank from which the money was borrowed did not require that petitioner's stock be pledged as collateral, Kuhn was required to promise the bank that until the bank's loan was paid in full, he would keep and control the stock. It has been observed often that a taxpayer is bound by what he did and he cannot prevail upon the basis of what he could have done but did not do. As a matter of fact, from the entire record it is evident that the money to drill and equip the 9 gas wells could not have been obtained from the bank unless Kuhn had had control of petitioner's stock, and he obtained that by paying $1,000 to petitioner for the stock. There is little merit in petitioner's

contention that Kuhn was not its sole stockholder, except for the qualifying shares. See *Wisconsin Memorial Park Co.*, 28 T. C. 390, 406, affd. 255 F. 2d 751, where we rejected the same contention. It is held that 95 per cent of petitioner's stock was owned by Kuhn in the years which are involved, and that therefore there was the relationship between petitioner and Kuhn which is described in section 24 (b) (1) (B), to which subsection (3) of section 24 (c) refers, and that the condition described in subsection (3) of section 24 (c) existed in 1950 and 1951, and in the short period prescribed following the end of each year. It is concluded that since all of the three conditions existed which are set forth in section 24 (c), it bars the claimed deductions for accrued and unpaid interest in 1950 and 1951. Respondent's determination is sustained. See *Hoyt B. Wooten*, 12 T. C. 659, affd. 181 F. 2d 502.

*Intangible drilling and development costs.*—The next question is whether section 24(c) bars deduction in 1950 of all of the intangible drilling and development costs, in the amount of $139,327.30, which petitioner elected to deduct as an expense from its gross income for 1950. It has been held above that under respondent's regulation, we must look to section 23(a) in connection with determining the year, if any, in which the expense may be deducted, and in this respect the provisions of section 24(c) properly are to be considered.

In deciding the preceding issue, we held that Kuhn owned 95 per cent of petitioner's stock in 1950 and other years which are involved, so that the condition in subsection (3) of section 24(c) existed. The question to be decided under this issue is whether the condition set forth in subsection (1) of section 24(c) existed in 1950 or within 2½ months after the end of 1950. That is to say, the question is whether petitioner paid expenses in the entire amount of $139,327.30 in 1950, or within the short period following the end of that year.

Petitioner, without question, accrued the expense because all the work in drilling and completing the 9 gas wells was done before the end of 1950, so that petitioner's obligation and the amount thereof was fixed in 1950. *United States* v. *Anderson*, 269 U. S. 422. We are unable to agree with respondent that all of its share of the expenses, $175,500, was not paid by petitioner in 1950. Respondent errs in his unwillingness to recognize that petitioner received as a loan from Kuhn the sum of $175,500, and that petitioner then turned that sum over to Kuhn so that he could drill and equip 9 gas wells under and in compliance with the drilling contract of January 18, 1950, entered into by the petitioner and Kuhn. In considering the entire evidence, it is our belief that a practical view of the arrangements must be taken under all of the circumstances. In so doing, we believe that it is proper here to regard the evidence as showing that separate steps were

taken and that Kuhn, in fact, acted in separate and distinct capacities. For example, he was engaged as an individual in the business of a drilling contractor and producer of gas and oil, he was well established in that business before petitioner was organized; he had an excellent line of credit with banks as an independent contractor. He did not originate or conceive the project for which petitioner was formed, according to the record before us. In our opinion, the drilling contract with Kuhn must be given the same status as a contract with any other independent well-drilling contractor.

Respondent agrees that a loan of $175,500 was made to petitioner in 1950. The evidence shows that a bank made the loan and the funds came to petitioner through Kuhn who gave his note. However, petitioner gave security to the bank for the loan. The gas leases, in which petitioner had a 75 per cent interest, were pledged with the bank as security, so that it seems clear that in 1950 petitioner was in a realistic sense concerned with the bank as a creditor. The loan from the bank was not fully paid until 1951, so that the gas leases were pledged to the bank throughout 1950.

Taking the above points into account as well as the practical aspects of the arrangements, we conclude that the steps which must be recognized are that petitioner had $175,500 in 1950, as a result of the loan to it, and that since Kuhn expended all of that sum in 1950 in his work under petitioner's drilling contract with him, it must be held that petitioner expended and paid to Kuhn all of the sum of $175,500 during 1950 under the drilling contract. We think it must be recognized, further, that the subsequent payments which petitioner made periodically to Kuhn, out of its receipts from sales of gas produced by the 9 wells, which periodic payments totaled $77,134.82 by the end of 1953, constituted payments by petitioner on its debt for the loan of $175,500, which was owing to Kuhn, and not the bank, after Kuhn had paid his note to the bank in 1951 and thereby obtained release of the pledge of the gas leases. Respondent, by conceding that a loan of $175,500 was made to petitioner, is not able, in our opinion, to take the view which he takes of the facts. We are unable to see how respondent can agree that $175,500 was loaned to petitioner and then deny that petitioner used and paid out that sum in 1950 to have the 9 gas wells drilled in which it had a 75 per cent interest. For that purpose, the above sum was borrowed from the bank. Kuhn borrowed more than $175,500 from the bank, according to his testimony. He paid 25 per cent of the costs of drilling and equipping the 9 wells in which he owned a 25 per cent interest, and for that part of the total cost, he used partly funds which he borrowed from the bank over and above $175,500, and, it appears, some of his own capital, as we understand his testimony.

The Commissioner has taken the view in the past that where a taxpayer makes payment by using and applying borrowed funds, the deduction for the expenses so paid must be deducted in the year of expenditure and not in the year of repayment of the loan. *Hazel McAdams*, 15 T. C. 231, affd. 198 F. 2d 54; *E. Gordon Perry*, 28 B. T. A. 497; *Consolidated Marble Co.*, 15 B. T. A. 193. It is the same where the funds are advanced directly for construction cost by the creditor on behalf of the debtor taxpayer. *Hazel McAdams, supra*. This is also true for an accrual basis taxpayer as long as the expenditure has actually been made. *Consolidated Marble Co., supra*. As an accrual basis taxpayer, it was necessary that petitioner's liability be fixed and definite before the deduction could be allowed. *Noxon Chemical Products Co. v. Commissioner*, 78 F. 2d 871, certiorari denied 296 U. S. 647. Upon completion of the wells in 1950 this requirement was satisfied. And it is our conclusion that petitioner made payment in 1950 of all of its share of the costs of the wells.

Since the promulgation of G. C. M. 23243, 1942-1 C. B. 78, revoking G. C. M. 23034, 1942-1 C. B. 75, it has been the rule that intangible drilling costs may be deducted as a business expense irrespective of the legal relationship between the taxpayer and the driller. The fact that petitioner paid for the drilling costs out of borrowed funds does not militate against petitioner under this issue.

It is concluded that the condition described in subsection (1) of section 24 (c) did not exist in 1950. Therefore, all of the conditions described in section 24 (c) did not exist in 1950. *Platt Trailer Co., supra*. It follows, therefore, that section 24 (c) is not a bar to allowing petitioner a deduction in 1950 for all of the intangible drilling expense in the amount of $139,327.30, which is the part of $175,500 which was properly allocated to intangible drilling costs. It is held that respondent erred in denying petitioner deduction of all of the $139,327.30 for intangible drilling expense in 1950. Respondent allowed a deduction (under his theory) of $6,700.53. Petitioner is entitled to deduction of an additional amount, $132,626.77. It follows that petitioner sustained a net operating loss in 1950, and that it is entitled to deduct for 1951, 1952, and 1953, carryover of the 1950 net operating loss.

*Decision will be entered under Rule 50.*