M. O. RIFE, JR., AND MAIDEE W. RIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 89682. Filed March 6, 1964.

*Whitfield J. Collins* and *Robert A. Watson,* for the petitioners.
*Douglas M. Moore,* for the respondent.

---

734

## OPINION

### *Issue 1*

The first issue is whether petitioners are entitled to deduct intangible drilling and development expenses as of the time such expenses were incurred and charged to petitioner's drawing account with Drilling, a partnership in which petitioner was a principal partner, or in a subsequent year when the accounts of the partnership were closed. Petitioners take the position that these expenses are deductible as of the time they were charged to petitioner's drawing account by the partnership. It is respondent's position that petitioner, who keeps his books and reports his income on the cash basis, did not pay the amount of such expenses until the end of the taxable years of the partnership (March 31, 1956, 1957, and 1958) when the debit balances in his drawing account were offset against his distributable portion of partnership income and the debit or income balance closed out into his capital account on the partnership's books.

Petitioner owned and operated Production as a sole proprietorship. Production drilled various oil wells during the years involved primarily in joint ventures. Petitioner was also a five-sixths partner in Drilling, which partnership drilled all of the wells in which petitioner participated. This issue arises because petitioner, individually and doing business as Production, kept books and records on the cash basis and reported income for tax purposes on the calendar year, whereas the partnership, Drilling, kept its books and records on an accrual basis and reported partnership income on a fiscal year ending March 31.

All the drilling and development expenses incurred in the joint ventures in which petitioner participated and in drilling the wells in which petitioner owned 100 percent of the working interest, were paid currently by Drilling. Drilling billed Production for the entire amount of these drilling and development expenses and charged the amounts so billed to petitioner's drawing account. The other coventurers would pay their respective shares of the expenses to petitioner. Generally petitioner would turn these payments over to Drilling, and Drilling would credit such amounts to petitioner's drawing account. There is some evidence in the record that petitioner, from time to time, would make payments to Drilling from other sources, but petitioner has failed to show the amounts and times of these payments. The evidence fails to show that any such payments were for his portion of

drilling expenses and not for other charges to his drawing account. The parties have stipulated that "The amounts remaining charged to petitioner's drawing account with Rife Drilling Company at the end of each fiscal year included his share of the billings for development expenses by Rife Drilling Company." The inference from this stipulated fact is that no amount of petitioner's payments to Drilling other than the amount turned over to Drilling from payments to him from his coventures was for payment of drilling and development expenses. (From the stipulated figures in the record and the copy of petitioner's drawing account received in evidence when offered by petitioner, it appears that this inference cannot in fact be true. The unpaid balance in petitioner's drawing account as of December 31, 1955, appears to be approximately $101,000 as compared to a disallowance by respondent of intangible drilling expenses of $168,234.43. However, the burden of explaining this apparent inconsistency is on petitioners, and they have not explained it.) Petitioner has failed to prove that he made any cash payments to Drilling for development expenses and therefore we conclude that no cash payments were in fact made by petitioner to Drilling.

For each of the years here involved petitioner in computing his taxable income deducted his share of intangible expenses in the calendar year when the expenses were incurred and charged to his drawing account by Drilling. Respondent has disallowed the portion of these deductions taken by petitioner in the calendar years 1955, 1956, and 1957 that was charged to his drawing account during the period of April 1 through December 31 in each of these years and has allowed such amounts as deductions in each succeeding year.

Respondent contends that petitioner, being on the cash basis, cannot create a deduction for these expenses by a mere entry on the books of Drilling in a partner's drawing account. Respondent contends these charges represent advance distributions or advances of the partnership to the partner and as such cannot be recognized until the last day of the partnership's fiscal year when the charges and petitioner's share of partnership earnings were closed to petitioner's capital account. Since petitioner reports his income on the cash basis, the billing of the expenses to petitioner does not entitle petitioner to a deduction therefor. Petitioner must show payment of these expenses to be entitled to a deduction therefor. Petitioner recognizes this requirement but contends that the charging of the amounts to his drawing account by Drilling constitutes payment thereof by him.

The statutory provisions with respect to partnerships provide for a yearly separate computation of partnership income and the inclusion of a partner's distributive share of such yearly partnership income in his income for the taxable year in which falls the end of

the partnership taxable year.[2]  Section 1.731–1(ii), Income Tax Regs., provides the following:

(ii) For the purposes of sections 731 and 705, advances or drawings of money or property against a partner's distributive share of income shall be treated as current distributions made on the last day of the partnership taxable year with respect to such partner.

This regulation is consistent with not considering distributions to a partner by a partnership as income to the partner when received by him.[3]  If charges by a partnership to a partner's drawing account were to be considered as payment of such amounts by the partner, it would follow that such charges, being the equivalent of an advance by the partnership to the partner, should be considered as income to the partner.  The charges by Drilling to petitioner's drawing account for the drilling expenses owed by petitioner to Drilling were advance distributions from the partnership to petitioner just as any other advances.  These distributions are not to be accounted for by petitioner until the last day of the partnership's taxable year.  Since the partnership's taxable year did not close until March 31, the expenses, the deduction of which are here in issue, are deemed to have been paid by petitioner as of March 31, 1956, 1957, and 1958, as respondent has determined.

---

[2] SEC. 706. TAXABLE YEARS OF PARTNER AND PARTNERSHIP.

(a) YEAR IN WHICH PARTNERSHIP INCOME IS INCLUDIBLE.—In computing the taxable income of a partner for a taxable year, the inclusions required by section 702 and section 707(c) with respect to a partnership shall be based on the income, gain, loss, deduction, or credit of the partnership for any taxable year of the partnership ending within or with the taxable year of the partner.
SEC. 707. TRANSACTIONS BETWEEN PARTNER AND PARTNERSHIP.

(a) PARTNER NOT ACTING IN CAPACITY AS PARTNER.—If a partner engages in a transaction with a partnership other than in his capacity as a member of such partnership, the transaction shall, except as otherwise provided in this section, be considered as occurring between the partnership and one who is not a partner.
SEC. 731. EXTENT OF RECOGNITION OF GAIN OR LOSS ON DISTRIBUTION.

(a) PARTNERS.—In the case of a distribution by a partnership to a partner—

(1) gain shall not be recognized to such partner, except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution, and

(2) loss shall not be recognized to such partner, except that upon a distribution in liquidation of a partner's interest in a partnership where no property other than that described in subparagraph (A) or (B) is distributed to such partner, loss shall be recognized to the extent of the excess of the adjusted basis of such partner's interest in the partnership over the sum of—

(A) any money distributed, and

(B) the basis to the distributee, as determined under section 732, of any unrealized receivables (as defined in section 751(c)) and inventory (as defined in section 751(d)(2)).
Any gain or loss recognized under this subsection shall be considered as gain or loss from the sale or exchange of the partnership interest of the distributee partner.

[3] It will be noted that by statute payments in the nature of salary or interest are considered income when received by the partner. Sec. 707(c) provides:

(c) GUARANTEED PAYMENTS.—To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and section 162(a) (relating to trade or business expenses).

There is no evidence to support petitioner's contention that the charges to his drawing account for his share of the drilling and development expenses should be treated as loans. Drilling did the drilling of the wells and incurred the expenses in the first instance. Petitioner and his coventurers contracted with Drilling to drill wells for them just as if Drilling had no relationship to petitioner. Therefore when Drilling paid the drilling costs, it was paying its own liabilities. Drilling then billed petitioner not only for its costs but also its profit, or petitioner's total drilling costs. If nothing further had occurred until the end of Drilling's fiscal year and petitioner had at that time paid Drilling out of his partnership profits, the payment by petitioner would clearly show as of the date of the end of the partnership's fiscal year. There is nothing in the record to indicate that the charge of the amounts to petitioner's drawing account caused an account payable by petitioner to Drilling to become a loan from Drilling to petitioner. The transactions did not take the form of loans. They were treated on the partnership books as were other advances to petitioner as advances or advanced distributions. The cases cited by petitioner, *Hazel McAdams*, 15 T.C. 231 (1950), affd. 198 F. 2d 54 (C.A. 5, 1952), and *Island Gas, Inc.*, 30 T.C. 787 (1958), are distinguishable from the instant case since they involved loans and not advances from a partnership to a partner. Here the advance distributions are those between a partnership and a partner and are controlled by the provisions of sections 706 and 731 of the Internal Revenue Code of 1954.

We hold that respondent properly determined the year of the deductibility of petitioner's intangible drilling and development expenses. Because we find respondent's determinations to be correct, there is no net operating loss in 1956 to be carried back to 1954. The other adjustments which result from our conclusions as to this issue may be made under a Rule 50 computation.

## *Issue 2*

Petitioners in their brief summarize their argument with respect to the claimed invalidity of any deficiency for the year 1955 as follows:

the instant case and the *Reineman* and *Leonardo* cases are almost identical on this issue, and therefore, on the authority of said cases, the deficiencies proposed in the instant case for the calendar years 1954 and 1955 should be held invalid as having been made in violation of the provisions of Sec. 7605(b).[4]

---

[4] The cases cited are *Reineman* v. *United States,* 301 F. 2d 267 (C.A. 7, 1962), affirming an unreported decision of the United States District Court for the Northern District of Illinois, unofficially reported 9 A.F.T.R. 2d 1166, 61–1, U.S.T.C. par. 9386; and *Application of Leonardo,* 208 F. Supp. 124 (N.D. Cal. 1962). Apparently the use by petitioners of 1954 in this summarization of their argument was inadvertent since the deficiency determined for that year is due in its entirety to the disallowance of a net operating loss carryback from 1956 to 1954 which had been previously tentatively allowed in accordance with

Petitioners do not contend that the notice of deficiency for the year 1955 is invalid and a nullity so that this Court is without jurisdiction as to that year. See *Marjorie F. Birnie*, 16 T.C. 861 (1951).[5]

It is not necessary under the facts of the instant case to consider this problem which is not discussed by petitioners. The facts fail to show that petitioners were not aware that the revenue agent assigned to investigate the years 1956 and 1957, after petitioners had filed returns for each of those years and had filed an application for a tentative net operating loss carryback credit to 1954 and 1955 from the year 1956, was in fact examining petitioners' records for the years 1954 and 1955 and did not consent to such examination of their records for 1954 and 1955. It is shown that petitioners were not aware that the revenue agent making this second investigation proposed to make any adjustment in the intangible drilling expenses claimed as a deduction by petitioner in the year 1955. This, however, is very different from a showing that petitioners were not aware that the revenue agent was examining their books and records for these years.

Section 7605(b) does not protect a taxpayer from the use which may be made by the respondent of information obtained through a second examination of his books when the taxpayer requests such further examination or makes no objection thereto. It is a prohibition against the making of more than one examination of a taxpayer's

petitioners' application. Petitioner's argument otherwise is directed entirely to the year 1955.

Sec. 7605(b), I.R.C. 1954, provides:

(b) RESTRICTIONS ON EXAMINATION OF TAXPAYER.—No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

[5] To make such an argument would create a dilemma for petitioners. If the irregularity were not of such magnitude as to make the notice of deficiency a nullity, petitioners' failure to assign the irregularity as error in the original petition filed on October 25, 1960, would under such cases as *Commissioner* v. *Forest Glen Creamery Co.*, 98 F. 2d 968 (C.A. 7, 1938), reversing 33 B.T.A. 564 (1935), constitute a waiver of such irregularity. See also *Hulburd* v. *Commissioner*, 296 U.S. 300 (1935).

On the other hand, it would appear that if there were sufficient irregularity in the notice of deficiency to render it a nullity and thus deprive this Court of jurisdiction over the year 1955, petitioners would have an empty victory in securing a dismissal of the case. The facts show that the statute of limitations for the assessment of a deficiency for 1955 had been extended by petitioners to December 31, 1960. The deficiency notice was mailed to petitioner on July 26, 1960, and the petition filed on October 25, 1960. Therefore, at the time of the filing of the petition in this case the statute of limitations for assessment of a deficiency had not expired. Section 6503(a)(1) of the Internal Revenue Code of 1954, which provides for the suspension of the running of the period of limitation upon the issuance of a statutory notice of deficiency for the period during which the respondent is prohibited from making the assessment or from collecting by levy or a proceeding in court and for 60 days thereafter, contains the following parenthetical statement: "(and in any event, if a proceeding in respect of the deficiency is placed on the docket of the Tax Court, until the decision of the Tax Court becomes final)." If the notice of deficiency for 1955 is a nullity to such an extent that it is the equivalent of no notice of deficiency, it may well be that respondent could within the limitations period still available to him for the year 1955 give written notice of an examination, examine petitioners' books, and mail a proper notice.

books for a particular year unless the taxpayer requests otherwise or the Commissioner gives written notice that an additional examination is necessary. If a second examination is made with the knowledge of the taxpayer who raises no objection thereto, such taxpayer has waived the requirement of written notice even though respondent uses the information he obtains for a purpose not anticipated by such taxpayer at the time the second examination was made. *Philip F. Flynn*, 40 T.C. 770, 774 (1962), and cases there cited.

In the instant case there is no allegation in the supplemental petition filed July 7, 1962, which raised for the first time the issue of the question of the invalidity of the deficiency for the year 1955 because of respondent's failure to comply with the provisions of section 7605 (b), that petitioners did not know that revenue agent Kelly was examining their books and records for the years 1954 and 1955. It is quite unlikely that petitioners' failure to make such an allegation in the supplemental petition was inadvertent. This petition was filed after the decision of the Circuit Court of Appeals in *Reineman* v. *United States*, 301 F. 2d 168 (C.A. 7, 1962), affirming an unreported decision of the United States District Court for the Northern District of Illinois, unofficially reported 9 A.F.T.R. 2d 1166, 61–1 U.S.T.C. par. 9386, had been rendered. This supplemental petition was filed pursuant to an order of this Court granting petitioners' motion to reopen the record in this case, which motion was based primarily on the decision of the United States Court of Appeals for the Seventh Circuit in *Reineman* v. *United States, supra*. In the *Reineman* case the circuit court laid great stress on the fact that the taxpayer there involved was totally unaware of any reexamination while it was in progress. If such had been a fact in the instant case, certainly petitioners would have made such an allegation.

All the evidence on the issue raised by the supplemental petition was submitted by stipulation of facts. The stipulated facts contain no statement that the second examination was made without the knowledge and consent of the petitioners. The admitted allegations in the pleadings contain no such fact. Since petitioners have the burden of proof in this case, such a failure of proof would be sufficient to dispose of the issue adversely to petitioners.

However, we need not resolve this issue on the basis of petitioners' failure to carry their burden of proof for the clear inference from the admissions in pleadings and stipulated facts is that petitioners were in fact aware of and did consent to the second examination of their books for the years 1954 and 1955. The facts show that one of the largest adjustments proposed in the letter of July 1, 1959, sent by agent Kelly to petitioners was an increase in petitioner's partnership income for the year 1956 of $68,219.55, and that this proposed adjustment was one to which petitioners had previously indicated their disagreement.

The explanation for this increase was that the partnership income had been increased due to partnership adjustments.

The stipulated facts show that the partnership kept its books and records and reported its income on an accrual basis and for a fiscal year ended March 31. It is therefore immediately apparent that in determining this increase in partnership income includable in petitioners' income for the year 1956 the books of the partnership which revenue agent Kelly would have had to examine would have been the books for its fiscal year ended March 31, 1956. These books would cover the partnership's records of drilling done for petitioner's sole proprietorship for the period April 1, 1955, to December 31, 1955, showing total charges and the charges to petitioner's drawing account, as well as the leases on which the drilling was done. It is the disallowance of this item as a deduction in 1955 which gives rise to the deficiency in that year which petitioners are contesting herein. It would certainly be expected that when revenue agent Kelly determined from petitioner's books for 1956 that the total intangible drilling costs shown as charged during the partnership's fiscal year ended March 31, 1956, had not been deducted by petitioners in 1956, he would check to see if the balance of the amount were deducted in 1955.

Even more indicative of the fact that revenue agent Kelly reexamined petitioners' 1954 and 1955 books with the full knowledge and consent of petitioners is the fact that in the adjustments proposed in the attachment to the agent's letter of July 1, 1959, to petitioners, he determined a net loss of $5,961.61 for the year 1957, which by law petitioners would be entitled to carry back to the year 1955. This carryback might require the making of certain adjustments in the year 1955 to compute the reduction in tax occasioned by the carryback. The inference that the reexamination of petitioners' books for the year 1955 was with their knowledge and consent is further to be drawn from the fact that on February 19, 1959, after agent Kelly had notified petitioners of his proposal to examine the years 1956 and 1957 and that he was examining the year 1956 in connection with their application of net operating loss carryback to 1954 and 1955, petitioners signed a Form 872 extending the statutory period for the assessment and collection of income taxes for the year 1955 to June 30, 1960, and subsequently signed a similar waiver extending the period to December 31, 1960. Since the statute of limitations for an overpayment resulting from a net operating loss carryback is, under the provisions of section 6511(d)(2)(A), the period that ends with the 15th day of the 40th month following the end of the taxable year of the net operating loss which results in such carryback, there would have been no necessity for the petitioners' extending the statute of limitations for the year 1955 to obtain any overpayment which might have resulted

from 1956 or 1957 carrybacks to the year 1955 until shortly before April 15, 1960.

Petitioner's answer to respondent's argument in respect to the inference to be drawn from the signing of this waiver Form 872 is that it was purely routine. The evidence does not so show. If petitioners thought some change might be made from information on file with respondent which was obtained in the prior examination of their books from which respondent was contemplating making an adjustment to their 1955 income, they do not so state, and there is no evidence to show the nature of the other information then available to respondent.

The evidence also shows that petitioners filed an application for tentative carryback adjustment with respect to the years 1954 and 1955 from the year 1956. While petitioners only asked for the refund of taxes for the year 1954 on this application, they requested that the portion of the net operating loss not used in 1954 be applied to 1955 and set forth the income figures for the year 1955 to which the net operating loss was to be applied in the space provided therefor on page 2 of the form for application for tentative carryback.

Under section 6411(b), the Commissioner must within 90 days after the filing of an application for a tentative carryback adjustment, except in cases of mathematical error in computation, determine the decrease in tax in the prior year or years resulting from the carryback, credit such decrease against any unpaid amount of tax, and refund the balance if any. As petitioners point out, no examination of a taxpayer's books and records prior to allowance of a tentative carryback adjustment is contemplated by the statute. Petitioners, however, fail in their argument to consider the fact that the statutory scheme contemplates an examination of a taxpayer's books and records subsequent to such allowance to determine whether the tentative adjustment will stand as the final adjustment. In making such investigation, certain recomputations are necessary in the taxable years to which the loss is carried. See sec. 1.172–5(a)(3)(ii), Income Tax Regs. Petitioners in fact recognize the necessity of some examination of their books and records by revenue agent Kelly in connection with the carryback adjustments. In their reply to respondent's answer to their supplemental petition, petitioners make the following admission: "Admits that Petitioners' counsel stated that Petitioners were not contesting the propriety of reopening the taxable years 1954 and 1955 to the extent permitted by reason of the net operating carryback." This admission is very close to an admission that petitioners knew that revenue agent Kelly was examining their books and records for the years 1954 and 1955 and made no objection thereto until they considered the information so obtained to be used by respondent in a manner they had not anticipated.

Petitioners rely strongly on their protest filed after receipt of a 30-day letter attaching a copy of the report of revenue agent Kelly, as showing that they protested the second investigation of their books as soon as they were aware that such an investigation had been made. Petitioners' protest is a complaint to a proposed change in an item which had not been adjusted by the respondent when the first revenue agent investigated petitioners' books but gives no indication that petitioner was unaware of the second investigation. In this protest it is stated that subsequently 1955 "was reopened as to this item by Internal Revenue Agent Raymond F. Kelly, who conducted a second examination of taxpayer's records without complying with Internal Revenue Procedures." If any inference is to be drawn from this protest, it is that petitioners knew of the second investigation of their books but did not know that revenue agent Kelly proposed to change the deduction for intangible drilling costs they had previously agreed to for the year 1955.

The instant case is distinguishable on its facts from *Reineman* v. *United States, supra,* and *Application of Leonardo, supra,* and therefore we express no opinion as to the correctness of the results reached thereon. In those cases the taxpayers were unaware of the second examination and did not consent thereto but protested such action immediately upon learning thereof, whereas in the instant case petitioners knew of the second examination and made no objection thereto but merely protested respondent's use of the information he obtained from such examination to change an item in the computation of their taxable income which had not been changed in the prior examination.[6]

---

[6] There is another factual distinction in the instant case and the *Reineman* case which likewise could be considered fatal to petitioners' contention. Petitioners have failed to show that the information used to determine the deficiency for 1955 was not available to respondent except from the second examination of petitioners' books and records for the year 1955, a fact stressed by the Court in that case. From the nature of the adjustments made, it appears that such information might well have been otherwise available. We consider it unnecessary to discuss this factual distinction in the cases since the authorities are clear that by knowledge of a second examination without protest thereof, a taxpayer waives the requirement of section 7605(b) of written notice of such examination.

For the same reason we consider it unnecessary to discuss two other distinctions in the instant case and the *Reineman* and *Leonardo* cases. However, it might be noted that the proper answer to the question of whether a taxpayer's application for allowance of a tentative carryback adjustment to 2 prior years is tantamount to a request for reexamination of that taxpayer's books for those years is not free from doubt. Neither is the question of whether the printed statement on the tentative carryback allowance form that "this allowance is a tentative adjustment pending an audit of the returns concerned" is written notice of an examination of the year to which net operating loss carrybacks have been claimed on the application for tentative carryback allowance, one which could be summarily disposed of.

A further distinction in the instant case and the *Leonardo* case is that the *Leonardo* case was an action for the suppression of evidence in a proposed criminal prosecution. The court ruled that evidence obtained by the unauthorized examination could not be used in the criminal prosecution. In the *Reineman* case it appears from the findings of the District Court that the taxpayers objected to use of evidence obtained by the second examination in the determination of the deficiency and based their contention of the in-

It has long been held that "In the absence of a closing agreement, valid compromise, final adjudication, or the running of the statute of limitations, the Commissioner may make new and different assessments against the same taxpayer, for the same year, and in respect of the same type of tax." *William Fleming*, 3 T.C. 974, 984 (and cases there cited), affd. 155 F. 2d 204 (C.A. 5, 1946). All that the evidence here shows is that respondent has made such a second determination with respect to petitioners' 1955 income tax liability. Respondent's determination of deficiency in petitioners' income tax for the year 1955 is not invalid.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

BRUCE, *J.*, concurring: I concur with the majority in its disposition of the second issue on the facts of this case, but I would go further and make clear, what the majority has left open, that the failure of the Commissioner to comply with the provisions of section 7605(b) of the Internal Revenue Code of 1954 relating to a reexamination of a taxpayer's books and records, does not invalidate the deficiency determined. I would reach this decision with all due respect for, but notwithstanding, the opinion of the Court of Appeals for the Seventh Circuit in *Reineman* v. *United States*, 301 F. 2d 267 (1962), which stands alone in this field in the face of numerous judicial statements pointing the other way.

In my opinion there is nothing in the language of section 7605(b) or in the legislative history,[1] which requires a contrary holding. As this and other courts have repeatedly stated, that section of the statute (and its predecessors, section 1309, Revenue Act of 1921; section 1005, Revenue Act of 1924; section 1105, Revenue Act of 1926; and section 3631 of the Internal Revenue Code of 1939) merely provides for the relief of a taxpayer from unnecessary and repeated examinations of his books and records such as he might otherwise be subjected to under the provisions of sections 7602, 7603, and 7604. *J. S. McDon-*

validity of the deficiency on the basis that it could not have been determined except by the use of the evidence so obtained. In the instant case, all the basic facts necessary to support the determination of deficiency for the year 1955 were stipulated, the oral testimony being that of petitioners' accountant who was called as a witness by petitioners to explain certain details of billing by Drilling to petitioner, when payments were made by Drilling, and the meaning of certain notations on Drilling's records of petitioner's drawing account. The only right to object to the admission in evidence of any stipulated fact reserved by petitioners in the stipulation was on the grounds of materiality and relevancy. Even though the burden of proof in the instant case and in the *Reineman* case was on the taxpayer, whereas in the *Leonardo* case it was on the Government, it would nevertheless appear that by failing to object to use of evidence obtained by the second examination on such ground, all rights to contest the validity of a determination based on evidence so obtained might be considered as waived.

[1] H. Rept. No. 350, 67th Cong., 1st Sess., p. 16 (1921); S. Rept. No. 275, 67th Cong., 1st Sess., p. 31 (1921); Conference Committee report, H. Rept. No. 356, 69th Cong., 1st Sess., p. 55 (1926).

*nell*, 6 B.T.A. 685, 691 (1927) ; *Executors of the Estate of George E. Barker*, 13 B.T.A. 562, 566 (1928) ; *Philip Mangone Co.* v. *United States*, 54 F. 2d 168, 172 (Ct. Cl. 1931) ; *Blevins* v. *Commissioner*, 238 F. 2d 621 (C.A. 6, 1956), affirming per curiam the conclusions and reasoning of this Court in a Memorandum Opinion (T.C. Memo. 1955–211, filed July 27, 1955) ; *Philip F. Flynn*, 40 T.C. 770, 774 (1963).[2]

It is true, as the court has pointed out in the *Reineman* case, that in the above cases the taxpayers had either failed to object or had consented to a reexamination. I do not think, however, that this detracts entirely from the importance of the statements therein as precedents. The question of the effect of the statute was considered by the Court in each of those cases. The statements were clearly not *obiter dicta;* although, under the factual circumstances, they may have been *judicial dicta.* Even so, such dicta frequently repeated and approved may thereby acquire strength and importance as precedents. 21 C.J.S. 317, Courts, sec. 2190 (d). Moreover, where a case presents two or more points, any one of which is sufficient to determine the ultimate issue, and the court decides all such points, the case is authority as to every point decided and none of such points can be regarded as having merely the status of dictum. *United States* v. *Title Ins. Co.*, 265 U.S. 472, 486; *Richmond Co.* v. *United States*, 275 U.S. 331, 340; *Massachusetts* v. *United States*, 333 U.S. 611, 623; *Woods* v. *Interstate Realty Co.*, 337 U.S. 535, 537; *Choctaw Nation* v. *United States*, 135 F. Supp. 536 (Ct. Cl.), certiorari denied 352 U.S. 825.

For the reasons stated, I concur in the result arrived at by the majority on the second issue.

TIETJENS, RAUM, FISHER, and TRAIN, *J.J.*, agree with this concurring opinion.

---

[2] The *Reineman* case was not referred to in the *Philip Flynn* case due to the fact that the *Reineman* case was not called to the Court's attention by either of the parties and did not otherwise come to our attention.